# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# (ATLANTA DIVISION)

JANE DOE K.D.

      Plaintiff,

  v.

ATLANTA DREAM CENTER.
CHURCH INC.; ATLANTA DREAM
CENTER. CHURCH INC. d/b/a
ATLANTA SCHOOL OF MINISTRY;
ATLANTA DREAM CENTER, INC.
a/k/a FRONTLINE RESPONSE
INTERNATIONAL, INC.;
ASSEMBLIES OF GOD; GEORGIA
DISTRICT COUNCIL ASSEMBLIES
OF GOD, INC.; MC FOUNDATION,
INC., d/b/a MISSION MOVEMENT
CORPS.; and JOHN DOES 1-50;

      Defendants.

Civil Action File No.:

## JURY TRIAL DEMANDED

---

## COMPLAINT AT LAW

      COMES NOW Plaintiff JANE DOE K.D. ("K.D." or "Plaintiff"), through the

undersigned counsel, bring this Complaint and Jury Demand (Complaint) for

trafficking and personal injuries and related damages against Defendants Atlanta

Dream Center. Church, Inc., Atlanta Dream Center. Church, Inc. d/b/a Atlanta

School of Ministry, Atlanta Dream Center, Inc. a/k/a Frontline Response

International, Inc., Assemblies of God, Georgia District Council Assemblies of God, Inc., MC Foundation, Inc. d/b/a Mission Movement Corps., and John Does 1-50 (collectively referred to as "Defendants") seeking damages and other review as the Court deems just and proper, showing the Court as follows:

## I.  INTRODUCTION

This case reveals a sophisticated human trafficking and forced labor operation disguised as a religious ministry. Young, vulnerable individuals, including the Plaintiff, were recruited nationwide with promises of missionary training, only to be systematically isolated, manipulated, and coerced into providing unpaid labor at sporting events, conventions, and corporate gatherings across the country.

The defendants in this case are the architects of this scheme. They are a diverse group, ranging from local ministries and churches to national religious organizations, prominent non-profits, and restaurant companies. The defendants collaborated for years in a sophisticated trafficking operation that operated openly under the guise of volunteer ministry work in exchange for college tuition, room and board.

Certain defendants operated a missionary school and church in Atlanta, Georgia, and engaged in nationwide travel to recruit devout Pentecostal teenagers and young adults who were aspiring to become missionaries and pastors. These

defendants targeted vulnerable individuals in impoverished areas with promises of housing, food, and the opportunity to satisfy the purported tuition debt through "volunteer" work spreading the gospel at corporate and sporting events.

Upon arrival, the students soon learned the promises were inaccurate and misleading. Students were subjected to abhorrent living conditions, including being crammed into overcrowded rooms and forced to sleep on cold floors or in vans in dangerous, crime-ridden areas of Atlanta and other major cities. They were forced to perform chores at the church for 12 to 14 hours a day, typically six days a week, with minimal time scheduled for their promised ministerial education.

The food the school and church provided was often expired, moldy, or infested with maggots. Basic healthcare was non-existent, and injuries were woefully neglected. Any concerns or questions as to the conditions were immediately dismissed by the school and church as questioning God's will, labeling the Plaintiff and other students as ungrateful. Plaintiff and other students were exhausted, malnourished, and emotionally distressed and had no outlet to raise concern or opportunity for corrective measures.

The church, school and corporate catering giant leveraged the purported tuition debt to exert further control over the students and to generate profit. To ostensibly satisfy their tuition debt, students were forced to work as "volunteer"

waiters, bartenders, and concession attendants for a major restaurant conglomerate. This work was performed involuntarily, often while the students were sick or injured, and without adequate breaks, food, or sufficient rest between shifts or any pay whatsoever.

The restaurant entities involved in this scheme generate billions in annual revenue. Despite this immense wealth, they refused to pay the trafficking victims for their extensive labor or to offer them habitable living conditions or food while Plaintiff and others worked their events. Instead, the restaurant entities made tax-deductible "donations" to various 501(c)(3) pass-through entities created by the church defendants, deriving dual financial benefits from both drastically reduced labor costs and substantial tax advantages.

The "debt" was never paid in full; there was always more work required. Even when the debt was purportedly paid, the wages went to pay another's debt, such that the students were forced into an endless cycle of forced labor – a modern form of debt peonage.

Plaintiff was a victim of this forced labor and abuse scheme. She endured physical and psychological abuse, sexual assault while working at catering events, and extortion from the church and school she trusted. The college degree and ministerial certification promised to her upon recruitment, and expected after the

extensive, laborious free labor provided under inhumane conditions, was never provided to Plaintiff. Instead, while under fear and threat of no longer being a part of God's Kingdom, because of serious medical issues she was required to make a terrifying escape from the school in the late-night hours, only to later be met with a bill from the school. The effect on her life has been profound, causing severe psychological trauma, economic hardship, and years of therapeutic expenses and professional development and earning opportunity lost.

Plaintiff brings several related claims under the Trafficking and Victims Reauthorization Act, negligence, and breach of fiduciary duty. Each defendant knowingly profited from their participation in the scheme of abuse and forced labor while ignoring the unmistakable signs of human trafficking that were plainly visible to anyone who chose to see. Defendants must be held responsible for their incredibly egregious misconduct to which they subjected the Plaintiff.

## II. **THE PARTIES**

1.     PLAINTIFF JANE DOE K.D. is a natural person and resident of Georgia. Plaintiff submits to the jurisdiction of this Court by filing this Complaint. The identity of Plaintiff K.D. is not pleaded in this Complaint to protect her identity because she was a victim of trafficking. Plaintiff K.D.'s identity will be made known to Defendants by separate communications and disclosed upon the entry of a Protective Order. See *Doe v. Archdiocese of Atlanta*, 328 Ga. App. 324 (2014).

2.      DEFENDANT ATLANTA DREAM CENTER, CHURCH INC. ("ADCC") is a domestic nonprofit corporation registered to do business in the state of Georgia and can be served with legal process on its registered agent, Paul Palmer, 635 Angier Avenue, Atlanta, Fulton County, Georgia 30308.

3.      DEFENDANT ATLANTA DREAM CENTER, CHURCH INC. a/k/a and d/b/a ATLANTA DREAM CENTER SCHOOL OF MINISTRIES ("ADCSOM") and ATLANTA SCHOOL OF MINSITRIES ("ASOM"), directed by Dan Palmer, had its principal place of business at 652 Angier Avenue, Atlanta, Fulton County, Georgia 30308.

4.      DEFENDANT ATLANTA DREAM CENTER, INC. a/k/a FRONTLINE RESPONSE INTERNATIONAL, INC., ("ADC" or "FRONTLINE") is a domestic nonprofit corporation registered to do business in the state of Georgia and can be served with legal process on its registered agent, Registered Agents Inc., at 8735 Dunwoody Place, STE R, Atlanta, Fulton County, Georgia 30350.

5.      DEFENDANT ATLANTA DREAM CENTER. CHURCH INC. ("ADCC"), DEFENDANT ATLANTA DREAM CENTER. CHURCH INC. a/k/a and d/b/a ATLANTA DREAM CENTER SCHOOL OF MINISTRIES ("ADCSOM") and ATLANTA SCHOOL OF MINISTRIES ("ASOM") and DEFENDANT ATLANTA DREAM CENTER, INC. a/k/a FRONTLINE RESPONSE INTERNATIONAL, INC. (FRONTLINE") (collectively referred to as

"ADC DEFENDANTS" ) is responsible for the actions of its employees, agents, and representatives, acting on its behalf through the legal doctrines of respondeat superior and vicarious liability.

6.    DEFENDANT ASSEMBLIES OF GOD ("AOG") is a domestic nonprofit corporation registered to do business in the state of Missouri and can be served with legal process on its registered agent, Donald P. Johns, at 3900 S. Overland Ave, Springfield, Green County, Missouri 65807. Defendant Assemblies of God is responsible for the actions of its employees, agents, and representatives, acting on its behalf through the legal doctrines of respondeat superior and vicarious liability.

7.    DEFENDANT GEORGIA DISTRICT COUNCIL ASSEMBLIES OF GOD, INC. ("GA AOG") is a domestic nonprofit corporation registered to do business in the state of Georgia and can be served with legal process on its registered agent, Jack C. Moon, at 6330 Peake Road, Macon, Bibb County Georgia 31221. Georgia District Council Assemblies of God, Inc. is responsible for the actions of its employees, agents, and representatives, acting on its behalf through the legal doctrines of respondeat superior and vicarious liability. DEFENDANT ASSEMBLIES OF GOD ("AOG") and DEFENDANT GEORGIA DISTRICT

COUNCIL ASSEMBLIES OF GOD, INC. ("GA AOG") are collectively referred to as "AOG DEFENDANTS."

8.    DEFENDANT MC FOUNDATION, INC., is a domestic nonprofit corporation registered to do business in the state of Georgia and can be served with legal process on its principal officer, Daniel Palmer at 723 Waveland Drive, Woodstock, Cherokee County Georgia 30189.

9.    DEFENDANT MC FOUNDATION, INC. d/b/a MISSION MOVEMENT is a domestic nonprofit corporation registered to do business in the state of Georgia and can be served with legal process on its principal officer, Daniel Palmer at 723 Waveland Drive, Woodstock, Cherokee County Georgia 30189.

10.    DEFENDANT MC FOUNDATION, INC. and DEFENDANT MC FOUNDATION, INC. d/b/a MISSION MOVEMENT (collectively referred to as "MM DEFENDANTS"). MM DEFENDANTS are responsible for the actions of its employees, agents, and representatives, acting on its behalf through the legal doctrines of respondeat superior and vicarious liability.

11.    The true names and capacities of Defendants, whether individual, corporate, associate, or otherwise, sued herein as JOHN DOES 1 through 50, (hereinafter: "JOHN DOES") inclusive, are currently unknown to Plaintiff, who therefore sue Defendants by such fictitious names. Plaintiff will seek leave of court

to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as JOHN DOES when such identities become known.

12.    Plaintiff is informed and believes, and thereon alleges, that the JOHN DOES  Defendants are the partners, agents, or principals and co-conspirators of Defendants and of each other; that Defendants and the JOHN DOE Defendants performed the acts and conduct herein alleged directly, aided and abetted the performance thereof, or knowingly acquiesced in, ratified, and accepted the benefits of such acts and conduct, and therefore each of the JOHN DOE  Defendants is liable to the extent of the liability of the Defendants as alleged herein.

13.    Plaintiff is further informed and believes, and thereon alleges, that at all times material herein, each Defendant was completely dominated and controlled by its co-Defendants and each was the alter ego of the other. Whenever and wherever reference is made in this complaint to any conduct by Defendant or Defendants, such allegations and references shall also be deemed to mean the conduct of each of the Defendants, acting individually, jointly, and severally. Whenever and wherever reference is made to individuals who are not named as Defendants in this complaint, but were employees and/or agents of Defendants, such individuals, at all relevant times acted on behalf of Defendants named in this complaint within the scope of their respective employments.

### III.   <u>JURISDICTION AND VENUE</u>

14.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves claims arising from a federal question under 28 U.S.C. §§ 1581, 1584, 1589, 1590, 1595(a).

15.    Venue is proper in this Court as one or more of the Defendants reside and maintain a principal office in the Northern District of Georgia (Atlanta Division) and this suit is brought against all Defendants as joint tortfeasors.  G.A. Const. Art. I, § 2, ¶¶ III, IV & VI; O.C.G.A. §§ 9-10-31, 9-10-93, 14-2-510.

### IV.   <u>STATEMENT OF FACTS</u>

**<u>Plaintiff is a Survivor of Trafficking, Neglect, Forced Labor, and Abuse</u>**

**A. Plaintiff is Recruited by ASOM and Moves to Georgia under the Guise of Becoming a Missionary**

16.    On or about 2012-2013, the ASOM Travel Team came to Plaintiff's church in Missouri to perform for the youth group and share information about ASOM. During this time, the members of the ASOM Travel Team encouraged youth group members to join ASOM in Atlanta, Georgia.

17.    The ASOM Travel Team/ADC Defendants represented that the school was a place where the youth could learn to minister, do missionary work, and engage in fun activities like dance team, art, spoken word, and more.

18.    Sometime after the ASOM Travel Team/ADC Defendants came to Plaintiff's church in Missouri, she decided to attend ASOM to study ministry and participate in missionary work. It was Plaintiff's goal to focus on school and becoming a missionary when she attended.

19.    Based on the verbal representations of the ADC Defendants, ASOM Travel Team and the materials Plaintiff had access to, including materials from ADC Defendants' websites,  Plaintiff understood that volunteering would be part of her missionary work including feeding the homeless and volunteer at schools;  however, it was not disclosed to her that she would be, nor did she expect to be, trafficked and to be forced to provide countless hours of free labor.

20.    Plaintiff arrived at ASOM in 2014-2015 and was assigned to a high-rise apartment complex located at 444 Highland Drive Northeast in Atlanta, Georgia.

21.    The room and board provided by the ADC Defendants was not as represented to Plaintiff and it was inconsistent with their promotional materials.[1]

22.    Plaintiff was forced to share a tiny one-bedroom (7 foot by 7 foot) apartment within a complex known for its high crime, violence and deplorable conditions, with three other students. The bedroom contained two bunk beds, both with soiled mattresses.

23.    They had no choice but to eat food that was often expired and insect

---

[1] https://web.archive.org/web/20140723090929/http://atldcsom.org/2013/interest-cost/-

ridden.

24.    Unbeknownst to Plaintiff, and undisclosed by ADC Defendants, previous tenants that rented these apartments reported:

- "This place is on Boulevard which is highly dangerous. Don't walk down the street past the BP gas station. Even there is kind of sketchy because I know someone who got their car stolen there. Its like the hood over there down to the end of the block and there have been murders. If you park your car in the parking deck, be mindful of possible break-ins at night."[2]
- "Safety: bad area. End of story."[3]
- "There's a pest problem."[4]
- "When you look for a place to live, the first priority is security. This building is not secure! The area is not secure! I have lived here for nearly 3 weeks, and I've learned not to walk outside at night. It is right by the worst area of Atlanta, there was a shooting just a couple weeks ago."

25.    Despite ADC Defendants' representation that Plaintiff relied upon, she was unsafe and subjected to dangerous conditions and inhumane housing.

## B. The ADC Defendants Forced Plaintiff to Work Long Hours in the Kitchen Unpaid

26.    Instead of doing volunteer work as part of her missionary work, Plaintiff was forced to do chores and labor for the ADC Defendants usually under terrible working conditions.  During her time at the school, Plaintiff recalls first

---

[2] https://www.apartmentratings.com/ga/atlanta/444-highland_9199332346275149921/?page=1#ratingsReviews
[3] https://www.apartmentratings.com/ga/atlanta/444-highland_9199332346275149921/?page=1#ratingsReviews
[4] Id.

being instructed to work in the kitchen facilities, where she was required to prepare and serve meals to other students without any compensation.

27.    If at any time Plaintiff refused a direct order from the ADC Defendants she was threatened and religiously manipulated, that she would "not inherit the Kingdom of Heaven" and "God wasn't pleased with her."

28.    The ADC Defendants compelled Plaintiff to work in the kitchen facilities six days a week for approximately 8 to 10 hours per day.

29.    Plaintiff was forced to prepare and serve meals for her fellow students under deplorable conditions. The kitchen conditions where Plaintiff was forced to work were grossly unsanitary and posed serious health hazards.

30.    The food provided for Plaintiff and others, which was donated to ADC Defendants for free, was routinely stored in areas infested with flies, maggots, and rodents, creating an environment that violated basic health and safety standards.

31.    The ADC Defendants failed to provide Plaintiff with appropriate training, safety equipment, or sanitary supplies necessary for food preparation.

32.    The ADC Defendants forced Plaintiff to repeatedly prepare and serve food that was visibly rotten, contaminated with rodent feces, and that was dangerously unsanitary, putting both herself and other students at serious risk of illness.

33.    The ADC Defendants forced Plaintiff to sift through piles of expired,

13

spoiled food requiring her to cut out bruising, mold, and insects from fruits, vegetables, and bakery items before serving the food to her fellow students.

34.     During her forced kitchen duty, Plaintiff cut her finger while chopping vegetables and bled into the bowl. The ADC Defendants would not let her throw out the contaminated food.  Instead, the ADC Defendants forced her to just rinse the blood off the food with water and serve it to her fellow students.

35.     After a fellow student vomited into a box of apples, the ADC Defendants forbade Plaintiff from throwing the box of apples away and instead forced her to rinse the apples to then serve to her fellow students.

36.     As a result of consuming spoiled and contaminated food, Plaintiff and her fellow students often suffered from gastrointestinal issues like diarrhea and vomiting, often leading to malnutrition.

37.     During this time, Plaintiff was also forced to maintain a diet of the same spoiled, rotten, and contaminated food as her fellow students.  As a result, Plaintiff became malnourished and remained malnourished for the entire time she was at ASOM.

38.     Plaintiff was never compensated for her work in the kitchen, which, under comparable circumstances, she would have been paid between $7.25 to $10.00 per hour in Georgia during 2014-2015.

39.     As a direct result of these conditions, Plaintiff suffered physical illness,

emotional distress, and economic harm. Plaintiff also suffered emotional damage knowing that she was serving hazardous and dangerously unsanitary food to her fellow students and putting them at risk.

### C. The ADC Defendants Manipulated, Groomed, and Controlled Plaintiff

40.    The ADC Defendants used shaming, religious manipulation, and grooming tactics to ensure Plaintiff was subservient, obedient, and silent. While Plaintiff was at ASOM, the ADC Defendants manipulated Plaintiff through express or implied threats of harm through public shaming and being subjected to humiliating and degrading treatment.

41.    If at any time Plaintiff refused a direct order from the ADC Defendants she was threatened and religiously manipulated, being told that she was "defiant" and "defying God."

42.    The ADC Defendants would threaten her that she would "not inherit the Kingdom of Heaven."

43.    The ADC Defendants also used shaming as a common tactic to control and punish Plaintiff.

44.    The ADC Defendants publicly berated and belittled her for making mistakes, not following directives, or making the wrong decision.

45.    The ADC Defendants made it clear that if Plaintiff disobeyed Pastor Dan Palmer she was disobeying God since Pastor Dan Palmer spoke directly to

God.

46.    The ADC Defendants also made certain Plaintiff witnessed and observed other fellow students being shamed, berated, and belittled to intimidate, threaten, and control her.

47.    The ADC Defendants unlawfully violated Plaintiff's personal liberty and privacy by subjecting her to forms of mental, physical, and economic cruelty.

48.    The ADC Defendants forced Plaintiff to disclose her complete sexual history, including a non-consensual sexual encounter, to them and her peers, disregarding the trauma it would inflict upon her and utilizing her disclosure against her.

49.    The ADC Defendants coerced Plaintiff to describe in explicit detail a violent sexual assault she had suffered at the age of 15.

50.    The ADC Defendants shockingly compelled her to read a detailed account of her traumatic assault aloud in front of them and her peers.

51.    The ADC Defendants then blamed her and shamed her for the sexual assault and forced her to "apologize" for bringing it on herself and for being the victim of a violent rape that occurred when she was a minor.

52.    These actions by the ADC Defendants caused Plaintiff severe emotional distress, psychological harm, violated her civil liberties and her right to privacy and only served to exert control and manipulation over the Plaintiff.

16

53.    The ADC Defendants obstructed Plaintiff's ability to communicate with her friends and her fellow students as a means to coerce, intimidate, and control Plaintiff.

54.    In one instance, the ADC Defendants ridiculed and berated Plaintiff for attending a birthday celebration thrown by a male peer at his home with other female students.

55.    In addition, the ADC Defendants lied and belittled Plaintiff to the male peer's parents erroneously accusing her of seducing their son.

56.    The ADC Defendants made examples of other students to reinforce their coercion, intimidation and control.

57.    Plaintiff recalls a fellow student who was suffering from a severe eating disorder and mental health issues who wanted to leave the school to obtain medical treatment and care. The ADC Defendants, including Pastors Daniel Palmer and Paul Palmer, refused that student's request to leave and threatened that if the student left ASOM, the police would be contacted and that the pastors would erroneously inform the police she was suicidal to ensure the police would detain her.

58.    From that point forward, Plaintiff felt imprisoned by the ADC Defendants, and she knew the ADC Defendants would never freely let her leave.

**D. The ADC Defendants and Restaurant Entities Forced Plaintiff to Work Events All Around Georgia**

59.    Throughout 2014-2015, the ADC Defendants forced Plaintiff to work at various sporting events, entertainment venues, and other facilities where restaurant entities provided catering and concession services (hereinafter generally referred to as "trafficking food service events"), including but not limited to professional and collegiate college sporting events, corporate events, popular entertainment events, and convention centers.

60.    The ADC Defendants told Plaintiff that she would work at the trafficking food service events in exchange for her earnings, her tuition, room and board would be paid.

61.    The ADC Defendants, including Pastor Daniel Palmer, repeatedly told Plaintiff that she had to work at the trafficking food service events to pay back her tuition.

62.    The ADC Defendants, including Pastor Daniel Palmer, told Plaintiff she could not refuse to work at the trafficking food service events, even when the amount of hours that she worked was well beyond whether tuition, room and board payments would be.

63.    The ADC Defendants regularly forced Plaintiff to work 12-14 hour shifts at the trafficking food service events.

64.    The ADC Defendants forced Plaintiff to work 12-14 hour shifts at an

Atlanta corporate event.

65.    The ADC Defendants forced Plaintiff to work 16-hour days at a convention center, at times over a 3–4 day period.

66.    The working conditions at the trafficking food service events were unconscionable and violated labor standards and human dignity.

67.    During Plaintiff's long work shifts, the ADC Defendants and the restaurant entities did not provide Plaintiff with breaks to use the bathroom, eat, or rest.

68.    The ADC Defendants did not provide food or money to purchase food while Plaintiff worked at the trafficking food service events.

69.    Often Plaintiff had no choice but to eat the left-over scraps of food from the event guests' plates when working at the trafficking food service events.

70.    If Plaintiff requested to use the bathroom during an event shift, the ADC Defendants scolded and reprimanded her, stating she was "not dependable" and that she was "ruining the school's reputation" and further, "representing the kingdom of God and making God look bad,"  creating a hostile and humiliating work environment.

71.    On multiple occasions, Plaintiff became ill while working at trafficking food service events due to the extreme working conditions.

72.    When Plaintiff returned to her dormitory after completing lengthy

shifts while ill, and informed the ADC Defendants of her medical condition, the ADC Defendants refused to provide necessary medical care, treatment, or an adequate rest period.

73.    Instead, the ADC Defendants demanded that Plaintiff either find someone to cover her next assigned trafficking food service event shift or report to the bus for the next shift in as little as two hours, despite her illness.

74.    The ADC Defendants' refusal to accommodate Plaintiff's medical needs demonstrated deliberate indifference to her health and well-being.

75.    Despite working numerous long hour shifts at trafficking food service events, Plaintiff was not compensated a penny for her work.

76.    The prevailing wage for comparable catering work in Georgia ranged from $7.25 to $12.00 per hour in 2014-2015.

77.    The ADC and MM Defendants never paid Plaintiff any monies for her labor.

78.    The restaurant entities never paid Plaintiff any monies for her labor.

79.    Despite working multiple weeks and 12-14 hours days over those weeks and months, the ADC Defendants told Plaintiff that her tuition of $7,000.00 was purportedly not paid either.

80.    The ADC and MM Defendants and restaurant entities never provided Plaintiff with documentation to show the hours she had worked and/or the total

amount of "donations" that had been given to the ADC Defendants in exchange for her free forced labor.

81.    The ADC and MM Defendants never provided Plaintiff with any receipts or documents showing that her tuition was being paid.

82.    The ADC and MM Defendants never credited Plaintiff's alleged tuition bill with any money she earned while working events.

**E. The ADC Defendants Subjected Plaintiff to Violence & Sexual Assault**

83.    Plaintiff was often exposed to danger and violence while attending ASOM and while working at trafficking food service events.

84.    The ADC Defendants knowingly and negligently placed Plaintiff in unsafe and potentially dangerous situations without supervision or protection on numerous occasions.

85.    The ADC Defendants forced Plaintiff, unpaid, to guard a pile of toys alone, on a street corner, at midnight in neighborhood known for their high crime rate, poverty and gang violence.

86.    As a result of the ADC Defendants' disregard and inactions she was a victim of an attempted robbery while watching the pile of toys.

87.    The ADC Defendants failed to implement any safety protocols, provide security personnel, or take any measures to protect Plaintiff while working at the trafficking food service events.

88.    While working at one event for the ADC Defendants, Plaintiff was sexually assaulted by a guest at the event.

89.    During this assault, a guest groped Plaintiff's buttocks and attempted to put his fingers down her pants.

90.    Plaintiff immediately reported the sexual assault to the ADC Defendants, who deliberately ignored the seriousness of the matter.

91.    Despite Plaintiff being the victim of sexual assault while performing duties for the ADC Defendants, they forced her to continue working for free at the same event where her assailant remained present.

92.    In fact, the only action taken following the sexual assault was that the ADC Defendants recommended she try avoiding the assailant for the remainder of the shift.

93.    The ADC Defendants told Plaintiff and other trafficking victims to use the "buddy system" because women could not be alone due to the _known_ risk of being sexually assaulted by event patrons.

94.    The ADC Defendants failed to report the sexual assault to proper authorities as required by law.

95.    As a direct result of the persistent abuse and neglect by the ADC Defendants, Plaintiff's mental and physical health significantly deteriorated.

## F. The ADC Defendants Exploited Plaintiff's Deteriorating Condition

96.    Plaintiff's unpaid long shifts in the kitchen, along with the forced free work at the various trafficking food service events, took a mental and physical toll on Plaintiff that cumulated while she was at ASOM.

97.    The ADC Defendants failed to provide Plaintiff and other students with proper health care, medical insurance, and medical treatment despite requiring them to work in hazardous conditions.

98.    Plaintiff was effectively denied access to necessary medical care due to the ADC Defendants' failure to provide health care insurance coverage, access to health care, and available medical treatment.

99.    Plaintiff could not independently afford healthcare, and she had no funds because the ADC and MM Defendants and the restaurant entities never paid her wages.

100.    The ADC Defendants fostered an environment where seeking medical treatment resulted in public shaming, humiliation and religious manipulation, further deterring Plaintiff from obtaining any needed health care or medical treatment.

101.    The ADC Defendants were aware of Plaintiff's deteriorating health condition yet deliberately failed to intervene or provide any medical care and appropriate support.

102.   The ADC Defendants' actions and inactions demonstrated a pattern of deliberate indifference to Plaintiff's safety, health, and well-being while under their supervision and control.

103.   As a direct and proximate cause of the ADC Defendants' conduct, Plaintiff's mental health and physical health deteriorated. She remained malnourished, lost 30 pounds resulting in an extremely unhealthy weight, and experienced severe sleep deprivation.

104.   Plaintiff's physical and mental health deteriorated to the point she determined she needed to leave school to obtain proper medical care.

### G. The ADC Defendants Sexually Assaulted and Threatened Plaintiff

105.   During a meeting with the ADC Defendants, including AOG Pastor Daniel Palmer, financial advisor Jeremy Amo, and Pastor Nathaniel, Plaintiff was subjected to another sexual assault and threats on her life.

106.   During the meeting, AOG Pastor Daniel Palmer engaged in grooming behavior and sexually assaulted Plaintiff by rubbing his hands on Plaintiff's bare legs and thighs without her consent. When Plaintiff explicitly demanded that AOG Pastor Daniel Palmer stop touching her, he deliberately continued the unwanted physical contact against her expressed disapproval.

107.   Pastor Daniel Palmer then became visibly angry at Plaintiff's refusals to accept his unwanted touching and made explicit threats against her life.

Specifically, Pastor Daniel Palmer threatened Plaintiff that she "would not make it to her 21st birthday" if she ever left his control.

108.   Pastor Daniel Palmer further intimidated Plaintiff by describing a disturbing vision he claimed to have had of her wearing a white wedding dress "dripping in blood," stating that she was "filthy in the eyes of the Lord." He then proceeded to tell Plaintiff that she didn't "deserve to be in his presence or to be here," further demonstrating the coercive and manipulative environment, using religion against her.

109.   These violent threats and intimidation tactics occurred in the presence of other individuals associated and affiliated with the ADC Defendants, who took no action to intervene or protect Plaintiff.

110.   Plaintiff was ultimately forced to leave ASOM in the middle of the night given how fear stricken she was over leaving so that she could get medical treatment.

**H. The ADC Defendants Continued to Abuse Plaintiff After She Left the School**

111.   The ADC Defendants continued to psychologically abuse Plaintiff after she left ASOM.

112.   The ADC Defendants fraudulently informed Plaintiff's parents and home church that Plaintiff was expelled from ASOM because she was caught

drinking alcohol.

113.   The ADC Defendants presumably did this to cover up the true circumstances under which Plaintiff left and to prevent her from telling anyone at home. The ADC Defendants' fraudulent statements to Plaintiff's parents and church unfortunately worked.

114.   Plaintiff's parents, also devoutly religious, believed the ADC Defendants' lies. As a result, Plaintiff's parents did not welcome her home, she was instead met with distain and shame predicated on Defendants' misrepresentations.

115.   Plaintiff's home church also believed in the ADC Defendants' lies and banned her from rejoining their church community.  As a result, Plaintiff lost a critical support community that could have helped her heal from the Defendants' abuse, neglect, manipulation, and exploitation.

116.   The ADC Defendants' abuse, harassment, threats, and manipulation continued after she left school.

117.   The ADC Defendants' financial advisor, Jeremy Amo, insisted she still owed money for tuition and room and board, despite the hundreds of hours the ADC Defendants forced her to work for free in the kitchen and at the trafficking food service events.

118.   Mr. Amo threatened to file criminal charges, and informed Plaintiff she would go to prison if she did not pay.

119.   The ADC Defendants' continued coordinated pattern of exploitation, manipulation, neglect, abuse, and threats caused Plaintiff to continue to suffer psychological trauma, including self-harm, suicidal ideation, even after she left the school.

120.   The ADC Defendants' continuing fraud, coercion, and manipulation had the desired effect on Plaintiff. She was scared and manipulated into believing her circumstances may have been a part of God's plan and not recognizing it was due to the Defendants' bad acts.

121.   The Defendants' conduct unknowingly causing Plaintiff to self-harm for 8 years and the scars, as she sees them today, are a reminder of the horrific time she spent being manipulated, abused, and neglected by Defendants.

122.   Since leaving Defendants' custody and control, Plaintiff suffered with mental health issues, and distress over whether God planned this path for her, resulting in the need for extensive treatment, including but not limited to talk therapy, antidepressants, and other medications.  Plaintiff was diagnosed with depression, anxiety, and anorexia/purging.

## V. **DEFENDANTS FACILITATED THE TRAFFICKING OF PLAINTIFF**

123.   The Defendants are all interrelated in purposefully complex ways through various 501(c)(3) companies, some of which are now defunct, operating with a changed name, or predecessors, successors or business that are d/b/as. The

individuals involved with these organizations remain consistent, such that a common scheme and control can be inferred.

124.    The Defendants all worked together in a business venture designed and maintained to exploit Plaintiff and other trafficking victims at ASOM to work for free at trafficking food service events. The result of that forced labor was a windfall of financial benefit for all but the trafficking victims.

**A. Atlanta Dream Center Defendants Facilitated Trafficking Activity that Resulted in the Trafficking of Plaintiff**

125.    ADC Defendants recruited children and young adults to become missionaries and ministers from rural, poverty-stricken communities with high crime rates across the country.

126.    As the ADC Defendants evolved over the years and their profits further increased, they moved to different locations and opened new programs including Atlanta Dream Center School of Ministry, later renamed, Atlanta School of Ministry ("ASOM") founded by Daniel "Dan" Palmer.

127.    ADC Defendants targeted vulnerable children and young adults who were devoted members of the Assemblies of God churches to study to become clergy members and missionaries.

128.    ADC Defendants represented to Plaintiff, and others, the following regarding its program:

"We provide a variety of options to learn and grow through our core

classroom sessions, hands on experience in specialized ministry tracks under the Dream Center staff, and you can even choose to get your Bachelor's Degree or ministers license."

129.   Despite these representations, Plaintiff and other survivors were instead subjected to forced labor, inhumane conditions and often never received a degree and their credits were not transferable to other public colleges and universities.

130.   ADC Defendants further represented to Plaintiff, and other poor and vulnerable youth, to persuade them to move to Georgia and join their organization, with the following:

> "Our tuition is a bargain! It includes meals (breakfast-dinner, Tuesday-Sunday), housing, classes, books and even some traveling experiences. We make our tuition lower for students than the actual cost because we live by faith. Jesus said count the cost…If you feel this is the place to you count the cost before you come and don't look back."

> "The food gets better and better each year."

> "Housing, water, gas, electricity… are all already included in the tuition for those who attend School of Ministry on campus. We challenge you to find anywhere that you can live this cheap and experience so much!"

131.   In reliance on these representations by the ADC Defendants, Plaintiff and other unassuming, poor youth, moved to Georgia and enrolled in their program with the hopes of becoming a missionary affiliated with the AOG and a higher education diploma or degree.

132.   Unfortunately for the Plaintiff and other victims, the food they were provided was expired, spoiled, bruised, moldy, contaminated, and insect and maggot-ridden.

133.   Plaintiff would also observe rodents residing in food that was later served to her and others. It was very common for survivors, including Plaintiff, to suffer from a food born illness and countless strains of viruses, bacteria, fungus and parasites which were highly preventable and could have resulted in a student's fatality.

134.   Plaintiff and other survivors were also forced to sleep in over-crowded, dilapidated, nearly condemned housing while in ADC Defendants' program.

135.   The horrors did not end with the inhumane conditions to which they were subjected by ADC Defendants and other Defendants, Plaintiff and other survivors were forced to work and perform excessive hours of hard laborious duties for free for weeks on end. Yet, this trafficking was falsely promoted by ADC Defendants as follows:

> "One of the blessings God has given us is… Students have the opportunity to be able to work $1000 off of their tuition or use that money to fund their foreign mission trip if their tuition is paid off. Jobs are chosen around our schedule. During the summer Second and Third year students can choose to work two very large jobs…That job is a more demanding three week job but help pay off at least 1/3 of a student's tuition."

136.   During these "jobs," Plaintiff and other trafficking victims were sent on trips by ADC Defendants to various states to work for the restaurant entities to provide catering services at well-known national events.

137.   They were labor trafficked during these trips.

138.   They were also not provided adequate food, housing or welfare.

139.   Plaintiff and other trafficking victims were forced to sleep in vans for only a few hours at a time, or in tiny, nearly condemned housing with dozens of other people, and they were not provided with adequate food or time to sleep.

140.    Plaintiff and other trafficking victims were often forced to work even when injured.

141.   Plaintiff and other trafficking victims reported the excessive hours of forced, free labor they were required to perform and the inhumane living conditions while working for the ADC Defendants, who took no corrective action.

142.   The ADC Defendants had both actual and constructive knowledge of the trafficking of Plaintiff at various trafficking food service events because the trafficking was the direct result of Defendants facilitating her free forced labor at those events.

143.   Defendants are responsible for the acts, omissions, and knowledge of all employees of the ADC and ASOM when operating its school and providing its students free labor because these acts and omissions were committed in the scope and course of their employs' employment, because Defendants ratified these acts and omissions, and because Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Defendants, of human trafficking at the various events where they

forced the students to work for free.

144.   Despite having actual or constructive knowledge of widespread and ongoing labor and sex trafficking at the trafficking food service events, the ADC Defendants continued to provide their students', including Plaintiff's, services free of charge to the restaurant entities, where Plaintiff and others were exploited, mistreated, neglected and subject to inhumane and unlawful conditions.

145.   The ADC Defendants knew or were willfully blind to the fact that Plaintiff was being trafficked and, despite this, benefited from continued association by receiving financial donations from the restaurant entities for the free services provided by Plaintiff, to facilitate her exploitation.

146.   The ADC Defendants also facilitated widespread trafficking, including of Plaintiff, in various ways including:

    a.  Developing and maintaining exploitive and illegal relationships with the restaurant entities through which students would be forced to provide free labor and be subjected to inhumane and unlawful conditions;

    b.  Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    c.  Ignoring all complaints of illness, exhaustion, distress from "volunteers" and instead forcing them to work at food service events with no sleep, no breaks, no food, and no rest;

    d.  Failing to contact law enforcement following reports of sexual abuse;

    e.  Utilizing a systemic practice of religious coercion and ridicule to prevent students from leaving the ADC Defendants' control and to keep them working at trafficking food service events and generating

revenue;

   f.  Entering into an exploitive relationship with restaurant entities that had been the subject of several wage and hour lawsuits, complaints, and investigations.

147.  The ADC Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of trafficking victims, including Plaintiff.

148.  The ADC Defendants knew that trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking through accepting donations.

149.  Policies purportedly enacted and enforced by ADC Defendants to identify signs of human trafficking and stop it from occurring were not properly implemented by either ADC Defendants or other Defendants.

150.  Plaintiff continued to be trafficked and Defendants were able to continue the trafficking venture at various trafficking food service events.

151.  Had any of the Defendants taken any action to prevent trafficking of their students and workers from occurring after full knowledge of the trafficking as described above, Plaintiff's trafficking would have prevented.

**B.  <u>MM Defendants Facilitated Trafficking Activity that Resulted in the Trafficking of Jane Doe K.D.</u>**

152.  Mission Movement Corp. ("Mission") was a 501(c)(3) affiliated with

AOG. It was listed on tax returns as MC Foundation, Inc. d/b/a Mission Movement (referred to collectively herein as "MM Defendants").

153.   On information and belief, the MM Defendants existed as an AOG-affiliated 501(c)(3) from approximately 2011 through 2024.

154.   The IRS revoked MM Defendants' 501(c)(3) status in 2024.

155.   MM Defendants were intertwined with the ADC Defendants in several ways.

156.   Each annual 990 lists AOG Pastor Daniel Palmer as the president of MM Defendants.

157.   Daniel Palmer was also director of ADC and a teacher at ASOM while he was the president of MM.

158.   Mission lists the following purpose on its 990 forms:

Spreading the good news of the gospel of Jesus Christ in venues outside the walls of the churches is the mission of the MC Foundation, Inc. Youth and young adults who participate in Master's Commission Christial[sic] and mission training around the country have an opportunity with the MC Foundation, Inc. to reach people for Christ at various sporting events, corporate dinners, large corporate events and other secular events. These youth and young adults volunteer at these events to share the gospel of Jesus Christ.

159.   Mission is referring to the trafficking food service events with the statement in paragraph 183.

160.   While ultimately a misrepresentation, MM Defendants' 990 statement is consistent with what the ADC Defendants told Plaintiff and other trafficking

victims: they would all be allowed to spread the gospel at corporate events; that their presence there was one of missionary service.

161.  Daniel Palmer and other ADC Defendants instructed Plaintiff and other trafficking victims to never talk to attendees at the trafficking food service events.

162.  Mission's website carried similar mis-messaging about volunteering in the "corporate world":



163.  The MM Defendants' website also directly linked MM to the common labor trafficking venture in which the MM Defendants would partner with "major catering companies" to provide "volunteers to staff suites, provide food and beverage runners…" and "[i]n turn **our partners pay your ministry for your time,"** a statement that ultimately provided to be untrue for Plaintiff and many others (emphasis added).

164.  The site also specifically mentions working with the ADC:



165.   On information and belief, Daniel Palmer created MM Defendants to receive and distribute monies from the restaurant entities in exchange for "volunteers" at the trafficking food service events.

166.   The IRS 990 Forms MM Defendants filed show a significant amount of annual revenue across almost a decade.

167.   On its 990 Forms, MM Defendants reported an average annual revenue of $1,053,580 for the years 2011-2019.

168.   Daniel Palmer is the only paid MM officer on the forms – receiving a direct Mission salary of between $24,000 and $35,000 during the 2011-2019 timeframe.

169.   The MM Defendants 990 Forms show regular, large distributions to ASOM to "further the organization's exempt purpose."

170.   There are no donations to any other entities listed on the Forms establishing that the sole purpose of MM Defendants was to siphon money from the restaurant entities to ADC Defendants in exchange for Plaintiff's and others, free labor.

171.   The ASOM donations range from $15,000 to $103,000 during the 2011-2019 timeframe.

172.   MM Defendants received and funneled significant amounts of money under the stated purpose of supplying labor to corporate events.

173.   On information and belief, MM Defendants received and processed hundreds of thousands of dollars for the "volunteer labor" of Plaintiff and others provided at the trafficking food service events through the ADC Defendants.

174.   On information and belief, the MM Defendants received monies from the restaurant entities in direct exchange for Plaintiff's forced labor at the trafficking food service events.

175.   On information and belief, MM Defendants processed hundreds of thousands of dollars from labor at the trafficking food service events under the guise of volunteer work.

176.   On information and belief, MM Defendants maintained the "bank account" for the labor trafficking venture of Plaintiff and others in which all Defendants participated in and benefited from.

177.    On information and belief, Daniel Palmer founded MM Defendants as a "pass through" to receive and distribute funds from the trafficking food service events and from other related forced labor missionary schemes.

178.    The MM Defendants knew this money was in exchange for the forced labor of trafficking victims, including Plaintiff.

179.    Daniel Palmer, and through him the MM and ADC Defendants, had direct knowledge that Plaintiff was being forced to work at the trafficking food service events for no pay.

180.    Daniel Palmer, on behalf of the MM Defendants and the ADC Defendants, encouraged it, and whenever Plaintiff resisted, he personally told her she must work otherwise she would be in violation of God's plan.

181.    The MM Defendants never paid Plaintiff any of the money that it received from her work at the trafficking food service events.

## C. Defendant Assemblies of God and Georgia District Assemblies of God Facilitated Trafficking Activity that Resulted in the Trafficking of Plaintiff

### 1. Assemblies of God: Ultimate Decision Maker and Fundraiser

182.    The General Council of the Assemblies of God ("AOG") is one of the largest Pentecostal denominations in the world, with a global reach of over 67 million adherents operating in more than 140 countries.

183.    Founded in 1914, the organization identifies itself as a "cooperative fellowship" rather than a traditional hierarchical denomination.

184.    The AOG is headquartered in Springfield, Missouri, where it maintains its administrative offices that oversee the operations of all its regional and local entities throughout the United States.

185.    Despite its characterization as a "cooperative fellowship," the AOG maintains significant control over its affiliated churches and entities through various mechanisms.

186.    The AOG establishes and enforces the "Statement of Fundamental Truths," a set of sixteen core doctrinal principles to which all affiliates must adhere.

187.    The AOG maintains final authority over the issuance of ministerial credentials, oversees the accreditation of affiliated religious educational institutions, and administers domestic and international missionary programs.

188.    The AOG also has final authority over the handling of complaints against ministers, including whether to revoke or suspend a ministers' credentials following allegations of abuse.

189.    Through these mechanisms, the AOG exercises substantial influence over the operations, teaching, and activities of its constituent bodies.

190.   The AOG finances its operations through a system of financial contributions flowing upward from local churches and ministers to district councils, and ultimately to the national organization.

191.   The AOG's financial guidelines recommend that each affiliated church contribute at least one offering per year specifically to support the administrative operations of the General Council.

192.   Ministers credentialed through the AOG are generally expected to tithe (give 10% of their income), with specific portions allocated to district and national operations according to district policies.

193.   These financial structures ensure a steady flow of resources from local congregations and their activities to the upper echelons of the organization.

194.   The Dream Center network, which includes the Atlanta Dream Center, traces its origins to the Assemblies of God.

195.   The original Dream Center was established in 1994 in Los Angeles specifically as "a home missions project of the Southern California District of the Assemblies of God."

196.   While some Dream Centers later formed affiliations with other denominations, many—including the Atlanta Dream Center—maintain their connection to the AOG.

197.   The AOG has supported the expansion of the Dream Center model throughout the United States as part of its missionary strategy, providing financial assistance, organizational support, and promotional resources.

198.   AOG was the mortgage lender and guarantor the ADC and ASOM.

199.   As these Dream Centers carry the AOG's doctrinal positions into urban environments and expand the denomination's reach, they become vehicles for increasing both membership and the financial base supporting the AOG's national operations.

200.   The AOG also benefits significantly from its missionary programs, both financially and in terms of membership growth.

201.   As missionaries like Paul Palmer of the Atlanta Dream Center establish new churches and outreach centers, they expand the AOG's influence and create additional sources of revenue flowing back to the organization.

202.   The AOG publicly recognizes and promotes these missionary efforts through official publications and financial support, establishing clear connections between the national organization and local missionary activities.

203.   AOG receives and processes donations on behalf of local missionary groups, like the ADC, and, on information and belief, retains a processing/administrative fee for all donations.

## 2. Georgia District Assemblies of God: Local Supervisor and Funder

204.   The Georgia District Council of the Assemblies of God ("Georgia District") serves as the regional governing body for AOG churches within Georgia.

205.   Operating as the critical intermediary between the national AOG organization and local churches, the Georgia District exercises direct oversight over churches and ministers within its geographic territory.

206.   The Georgia District maintains its headquarters in Macon, Georgia, where it administers programs, oversees ministerial credentialing within the state, and manages the financial relationship between Georgia churches and the national organization.

207.   The Georgia District has demonstrated direct financial support for the Atlanta Dream Center's activities, providing significant monetary contributions to further the center's expansion.

208.   In 2018, the Georgia District contributed $26,000 to allow the Atlanta Dream Center to purchase property for its "Out of Darkness" program aimed at sex trafficking victims.

209.   Records indicate that "Dream Center staff worked with the Georgia District to find the land," evidencing a collaborative relationship extending beyond mere financial support to include strategic planning and property acquisition.

210.   The Georgia District employs a tithe-based funding model whereby credentialed ministers within the district are expected to contribute a portion of their income to the district.

211.   This system creates financial incentives for the district to maximize the number of active ministers and ministry activities within its jurisdiction.

212.   As ministries like the Atlanta Dream Center expand their operations and engage more participants, the potential flow of financial resources to the district increases proportionally.

213.   The Georgia District benefits from the missionary and outreach activities of its affiliated entities in multiple ways.

214.   Successful ministries like the Atlanta Dream Center enhance the district's reputation and influence, potentially attracting new members and additional financial contributions.

215.   The Georgia District actively promotes these "success stories" through its communications channels, using them to demonstrate the effectiveness of its programs and justify continued or increased support from constituent churches.

216.   By maintaining close relationships with entities like the Atlanta Dream Center and providing substantial financial assistance for their expansion, the Georgia District has demonstrated its vested interest in the continued growth and operation of these affiliated organizations.

217.    This interest extends to the methods by which these organizations fund their activities, including partnerships with external entities through which the labor of program participants is exchanged for financial contributions.

### 3.  AOG and District Ignored and Profited from the Palmers' Abuse and Trafficking

218.    The Palmer family has been deeply intertwined with the ADC and AOG Defendants for decades.

219.    Paul Palmer remains an ordained minister with the Assemblies of God, having founded the Atlanta Dream Center in 2003.

220.    His son, Daniel "Dan" Palmer, served as the long-time CEO of the Atlanta Dream Center and was also an AOG credentialed minister.

221.    Daniel Palmer founded and operated the Atlanta School of Ministry beginning in 2013, which Plaintiff and other trafficking victims attended during their time at the Atlanta Dream Center.

222.    Throughout Plaintiff's entire period at the Atlanta Dream Center, Daniel Palmer facilitated systematic abuse and trafficking.

223.    On information and belief, Daniel Palmer maintained the ADC/MM/restaurant entities relationship for years, serving as the principal officer of the MM Defendants and Director of ADC.

224.   The MM Defendants' stated purpose on its 990 filings impliedly referenced sending youth and young adults to trafficking food service events to "volunteer at the events to share the gospel of Jesus Christ" at "various sporting events, corporate dinners, large corporate events and other secular events."

225.   On information and belief, the MM Defendants functioned as the financial conduit that received and managed the "donations" provided in exchange for Plaintiff's and other trafficking victims' forced labor at the trafficking food service events.

226.   To maintain this revenue stream, Daniel Palmer cultivated a systemic culture of abuse, intimidation, religious coercion, and manipulation designed to force Plaintiff and other trafficking victims to fulfill the ADC and MM Defendants' labor commitments to the restaurant entities.

227.   Daniel Palmer directly participated in the abuse of Plaintiff and other trafficking victims.

228.   He frequently engaged in inappropriate physical contact with young women at ADC/ASOM, including Plaintiff.

229.   He knowingly hired and retained multiple employees and pastors with documented histories of sexual abuse, even permitting one employee to return to student housing after being charged with sexually abusing a minor.

230.   When Plaintiff and others reported abuse to Daniel Palmer, he systematically dismissed these reports or, worse, blamed the victims, telling them they were questioning God's plan by reporting such incidents.

231.   On information and belief, Daniel Palmer fathered several children with young women at ADC/ASOM and expelled those women from the organization once their pregnancies became visible.

232.   Daniel Palmer employed religious and psychological coercion to prevent anyone from leaving ADC/ASOM.

233.   He told Plaintiff specifically that God would not love her if she left, that she would die if she left, and permitted others in his presence to threaten her with legal and financial consequences if she attempted to leave.

234.   With his knowledge and consent, others told Plaintiff and other trafficking victims that police would be called and falsely informed they were suicidal if they left, resulting in their detention.

235.   Daniel Palmer employed these tactics to maintain control over Plaintiff and other trafficking victims, ensuring they remained available for labor at the trafficking food service events.

236.   The Georgia District held direct supervisory responsibility for Daniel Palmer under the AOG's hierarchical structure.

237.   As the intermediate authority between the national organization and local ministers, the Georgia District bore the primary duty to monitor Daniel Palmer's church-related activities and business associations, including the receipt of initial complaints.

238.   The AOG, as the ultimate credentialing authority, possessed final jurisdiction over complaints and the exclusive power to revoke Mr. Palmer's ministerial credentials— the action that would have effectively terminated his ability to lead and operate an AOG-affiliated organization.

239.   On information and belief, both the Georgia District and AOG received multiple complaints regarding Daniel Palmer's conduct while Plaintiff was with the ADC Defendants.

240.   Despite their oversight responsibilities and explicit authority to investigate ministers' conduct, neither entity took substantive action to investigate or curtail Daniel Palmer's behavior and exploitative business relationships with the restaurant entities.

241.   He continued to openly traffic visibly malnourished, exhausted, distressed, and abused young adults for more than a decade, conducting these activities in plain view.

242.   Daniel Palmer was able to establish and maintain multiple 501(c)(3) organizations that processed money from the trafficking food service events

precisely because of his religious affiliation with, and presumed endorsement from, AOG and the District.

243.   The AOG and Georgia District's tacit approval gave these entities the veneer of legitimacy necessary to obtain and maintain tax-exempt status, creating the financial infrastructure that enabled the trafficking operation to flourish while generating revenue that flowed up the organizational hierarchy.

244.   The Georgia District and AOG finally revoked Daniel Palmer's ministerial credentials in 2021, following nearly two decades during which Daniel Palmer and the ADC Defendants neglected, abused, trafficked, and exploited hundreds of young adults for financial gain.

245.   Both the Georgia District and AOG knew or should have known of Daniel Palmer's conduct years earlier.

246.   On information and belief, the AOG Defendants received reports of Daniel Palmer's abuse at ASOM and ADC years before they revoked his ministerial license.

247.   The abuse exhibited unmistakable physical manifestations visible to anyone conducting even minimal oversight: trafficking victims' rapid weight loss, frequent illness, squalid living conditions in nearly condemned properties in dangerous neighborhoods, moldy and contaminated food, workers sleeping in vans or on cold wood floors, and "volunteers" fleeing in the night.

248.   These conditions were readily apparent to any reasonable observer.

249.   The District and AOG either had actual knowledge of these conditions or deliberately remained ignorant of them, allowing Daniel Palmer to maintain his lucrative agreements with the restaurant entities, which generated ongoing financial benefits flowing upward to both the Georgia District and AOG.

## VI.    DEFENDANTS CONSPIRED AND BENEFITTED FROM THE TRAFFICKING VENTURE

250.   Each of the Defendants knowingly received benefits from participating in the venture that facilitated trafficking, including Plaintiff's trafficking at the trafficking food service events.

251.   The ADC Defendants received substantial financial benefit from the for the school attendees forced labor at the trafficking food service events.

252.   The ADC Defendants were able to keep operating costs low through exploiting and manipulating Plaintiff and other trafficking victims, and by feeding them expired and moldy food and forcing them to live in squalid, near-condemned housing.

253.   The ADC Defendants did this while the MM Defendants received, on average, over $1 million dollars in revenue every year.

254.   AOG, on information and belief, received the financial benefit of distributions from the trafficking venture, either directly or indirectly, from the ADC and MM Defendants.

255.    On information and belief, AOG was the mortgage lender for ADC and ASOM. As a result, AOG profited from ADC and ASOM generating profit from the trafficking food service events to pay the mortgage.

256.    The ADC Defendants were all directly affiliated with AOG such that AOG, on information and belief, received, processed, and profited from missionary donations made to AOG for the ADC Defendants' alleged missionary work at the trafficking food service events.

257.    Georgia District, similar to AOG, and on information and belief, received the financial benefit of distributions from the trafficking venture, either directly or indirectly, from the ADC Defendants.

258.    The Georgia District, on information and belief, received monies from the ADC Defendants and MM Defendants that was earned through labor at the trafficking food service events.

259.    The Georgia District, on information and belief, received and profited from donations given to it on behalf of or related to the ADC and MM Defendants "missionary work" through which Plaintiff and other trafficking victims were forced to work at the trafficking food service events.

260.    The ADC and MM Defendants were directly affiliated with the Georgia District.

261.   The Georgia District had immediate control and supervision of the ADC and MM Defendants.

262.   On information and belief, all Defendants intentionally created and maintained their relationship within this forced labor trafficking venture for one reason: profit.

263.   The forced labor venture relied on a steady stream of impressionable, young, and naive workers who could be easily coerced and eventually forced into working without question. The ADC Defendants readily recruited such workers from around the country, then funneled them into working at the trafficking food service events.

264.   This forced labor venture generated hundreds of thousands of dollars each year, yet none of it went to the workers, who lived in sickness and filth without medical care.

265.   As detailed herein, the Defendants acted in concert as co-conspirators and were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

266.   Upon information and belief, operation of the Plaintiff's trafficking at the trafficking food service events was part of a single unified operation by Defendants.

267.   Upon information and belief, Defendants acted jointly to own, operate, control, manage, and supervise the Plaintiff at the trafficking food service events.

268.   As an integrated enterprise and/or joint venture, Defendants are separately and jointly responsible for compliance with all applicable laws.

## VII.  THE AOG DEFENDANTS ARE VICARIOUSLY LIABLE FOR THE ADC DEFENDANTS AND DANIEL PALMER

269.   The AOG Defendants are vicariously liable for the acts and omissions of Daniel Palmer and other ADC Defendant employees and representatives through principles of agency, authority, and ratification.

270.  The AOG Defendants maintained exclusive control over these individuals through a ministerial credentialing system, which gave AOG Defendants exclusive power to authorize or terminate Daniel Palmer's ability to operate AOG-affiliated ministries.

271.  The AOG Defendants promoted Daniel Palmer and other ADC Defendant employees and representatives as authorized representatives of the AOG religious organization, granting them the credentials, authority, and endorsement necessary to establish and operate the Atlanta Dream Center, Mission Movement, and the Atlanta School of Ministry as AOG-affiliated 501(c)(3) entities.

272.   Through their credentialing system, the AOG Defendants retained the right to control the conduct of Daniel Palmer and other credentialed ministers at

ADC and ASOM, including the power to investigate complaints, impose discipline, and revoke credentials for misconduct.

273.    On information and belief, the AOG Defendants received notice of labor trafficking and related abuse either before or while Plaintiff was under the direct physical control of the ADC Defendants.

274.    The Georgia District, as the regional governing body directly supervising Daniel Palmer, had primary responsibility to investigate complaints and monitor ministerial conduct within its territory.

275.    The Georgia District's failure to exercise this supervisory authority despite receiving complaints about Daniel Palmer constitutes ratification of his conduct and presumed participation in the labor trafficking venture.

276.    The AOG Defendants derived direct and continuous financial benefits from the ADC Defendants' and Daniel Palmer's trafficking and abusive activities through a tithe-based funding model, whereby a portion of revenues generated through the ADC Defendants' and Daniel Palmer's ministries flowed upward to the District and AOG.

277.    The AOG Defendants, on information and belief, derived other financial benefits from the ADC Defendants' and Daniel Palmer's trafficking and abusive activities through presumed expansion of AOG membership, financial donations to AOG/District to support related missionary work, and other financial

distributions from the ADC Defendants and Daniel Palmer taken from profits of their trafficking and abusive activities.

278.   The AOG Defendants actively participated in and financially supported the Atlanta Dream Center by providing substantial monetary contributions for its expansion, specifically including a $26,000 donation to purchase property for its "Out of Darkness" program, demonstrating their direct financial involvement in ADC operations.

279.   AOG representatives worked directly with ADC staff to locate property and coordinate strategic planning, showing substantive involvement in ADC operations.

280.   The AOG Defendants explicitly endorsed the ADC Defendants' and Daniel Palmer's ministry by:

    a.  Listing the Atlanta Dream Center in their official church directory;

    b.  Providing financial contributions for property acquisition;

    c.  Publicly recognizing Daniel Palmer and other ADC and ASOM ministers and pastors as "AG U.S. missionaries" in official publications; and

    d.  Collaborating with the ADC Defendants and Daniel Palmer on strategic planning and property acquisition.

281.   Daniel Palmer and other ADC Defendant employees and representatives operated within the scope of their approved affiliation with the AOG, conducting missionary activities that furthered the AOG's organizational purposes and doctrinal objectives.

282.   The AOG Defendants clothed Daniel Palmer and other ADC Defendant employees and representatives with apparent authority through their public endorsement, creating the reasonable impression among Plaintiff and other trafficking victims that Daniel Palmer's and other ADC Defendant employees' and representatives' activities were conducted with the approval and under the supervision of the AOG.

283.   The AOG Defendants ratified the conduct of Daniel Palmer and the ADC Defendants by continuing to endorse and financially support their ministries despite knowledge of complaints and visible evidence of abuse, neglect, and exploitation.

284.   The relationship between the AOG Defendants and Daniel Palmer was sufficiently close that the AOG Defendants knew or should have known of Daniel Palmer's exploitation of Plaintiff and other trafficking victims, yet the AOG Defendants continued to maintain Daniel Palmer's credentials and affiliation until 2021.

285.   The AOG Defendants' failure to revoke Daniel Palmer's credentials and disaffiliate him from his organizations during the relevant period, despite having both the authority and duty to do so, enabled the continued trafficking of Plaintiff and other victims.

## VIII.  <u>CAUSES OF ACTION</u>

### <u>COUNT ONE</u>
### (Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1581)
### (Against All Defendants)

286.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

287.  The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

288.  Plaintiff was a victim of forced labor trafficking in violation of 18 U.S.C. §§ 1581.

289.  Under 18 U.S.C. § 1581, it is unlawful to hold any person to a condition of peonage, which is compulsory service or labor performed by one person in payment of a debt.

290.  Defendants held Plaintiff to a condition of peonage by:

a.  Creating a system whereby Plaintiff and other trafficking victims incurred substantial tuition debt ranging from approximately $4,400 to $7,000 annually;

b. Falsely representing to Plaintiff and other trafficking victims that they could work off their tuition debt through participation in what Defendants termed a "volunteer" program to "share the gospel of Jesus Christ" at "various sporting events, corporate dinners, large corporate events, and other secular events";

c. Exercising complete control over Plaintiff's and other trafficking victims' living conditions, food, and basic necessities, creating dependency that reinforced and maintained the peonage relationship;

d. Requiring and forcing Plaintiff and other trafficking victims to work excessive hours of up to 14-20 hours per day, sometimes for weeks, with few or no breaks, meals, or rest;

e. Transporting Plaintiff and other trafficking victims to various job sites in Georgia;

f. Utilizing spiritual manipulation, religious pressure, threats of expulsion, threats of financial repercussions, threats of legal actions, and public humiliation to coerce and mandate continued work;

g. Creating and maintaining a system wherein the value of Plaintiff's labor, and that of other trafficking victims, far exceeded any credit they allegedly received towards their tuition debt; and

h. Deliberately conspiring to create and maintain a peonage system wherein Plaintiff and other trafficking victims remained in a continuous state of indebtedness and forced labor.

291. As described more fully herein, all Defendants knew or should have known that they were participating in and financially benefitting from a venture in violation of 18 U.S.C. § 1581.

292. As described more fully herein, all Defendants all received financial benefit from their participation in the continuing business venture of forced labor and peonage in violation of 18 U.S.C. § 1581.

293.   All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from its participation in a continuing business venture the Defendant knew or should have known was in violation of the TVPRA.

294.   Each of the Defendants is liable to Plaintiff under the TVRPA because they have all benefited and conspired to benefit from a venture in which Plaintiff and other trafficking victims were trafficked, harbored, and forced to work under a system of peonage in violation of U.S.C. § 1581.

295.   Each Defendant, through the acts and omissions more fully described herein, received a financial benefit from participating in a business relationship in which they recruited, exploited, and manipulated poor, impoverished, and devotedly religious kids and young adults from their local churches and communities around the country, including Plaintiff.

## **COUNT TWO**

**(Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1584)**
**(Against All Defendants)**

296.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

297.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

298.   Plaintiff was a victim of forced labor trafficking in violation of 18 U.S.C. § 1584.

299.   Under 18 U.S.C. § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude or to sell any person into any condition of involuntary servitude.

300.   Defendants knowingly held Plaintiff and other trafficking victims in a condition of involuntary servitude and "sold" Plaintiff and other trafficking victims to certain defendants for forced labor through the following acts:

    a. Creating and maintaining a system wherein Plaintiff and other trafficking victims were forced to work against their will at trafficking food service events;

    b. Requiring Plaintiff and other trafficking victims to work excessive hours without adequate breaks, food, or rest, against their will and in defiance of their requests to stop working;

    c. Entering into financial arrangements whereby defendants received substantial "donations" in exchange for providing Plaintiff's and other trafficking victims' labor at various trafficking food service events, effectively selling their labor at the trafficking food service events;

d. Deliberately structuring and conspiring to structure non-profit work and volunteer programs to evade labor and tax laws while obtaining the benefits of the labor of Plaintiff and other trafficking victims;

e. Retaining the financial proceeds from Plaintiff's labor and that of other trafficking victims while providing Plaintiff or other victims with little or no compensation;

f. Maintaining complete control over Plaintiff and other trafficking victims throughout the labor arrangement, dictating when, where, and for how long they would work, and under what conditions;

g. Continuing to utilize and profit from the labor of Plaintiff and other trafficking victims despite obvious and reported signs of exhaustion, distress, coercion, malnutrition, and illness;

h. Engaging in a continuing pattern of "selling" the labor of Plaintiff and other trafficking victims at trafficking food service events throughout the period of their enrollment at ASOM;

i. Deliberately concealing from Plaintiff and other trafficking victims the true financial arrangements between ADC and MM Defendants, including the total amount paid for Plaintiff's labor; and

j. Providing unsafe and unsanitary living conditions that further weakened Plaintiff's and other trafficking victims' physical and psychological wellbeing, increasing their vulnerability and dependence on the Defendants.

301. As described more fully herein, all Defendants all received financial benefit from their participation in the venture of selling Plaintiff in violation of 18 U.S.C. § 1584.

302. All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from its participation

in a continuing business venture the Defendant knew or should have known was in violation of the TVPRA.

303.   Each of the Defendants is liable to Plaintiff under the TVRPA because they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff and other trafficking victims were trafficked, harbored, and sold in violation of U.S.C. § 1584.

304.   Each Defendant, through the acts and omissions more fully described herein, received a financial benefit from participating in a business relationship in which they recruited, exploited, and manipulated poor, impoverished, and devotedly religious kids and young adults from their local churches and communities around the country, including Plaintiff.

## <u>COUNT THREE</u>

**(Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1589)**
**(Against All Defendants)**

305.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

306.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew

or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

307.   Plaintiff was a victim of forced labor through threats of harm in violation of 18 U.S.C. § 1589.

308.   Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide or obtain labor or services by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor or services.

309.   Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

310.   Under 18 U.S.C. § 1589(c)(1), it is unlawful to use or abuse a law or legal process legal process, in any manner or purpose for which the law was not designed, in order to exert pressure on another person.

311.   Under 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, reputational harm…"

312.    Defendants violated 18 U.S.C. § 1589 because Plaintiff's and other trafficking victim's labor was obtained through extreme emotional abuse, serious harm in the way of malnutrition and deprivation, and threatened legal and financial consequences.

313.    Defendants profited financially through these violations, and, as such, all Defendants are liable under 18 U.S.C. §§ 1589(b), 1595(a).

314.    As more fully described herein, Plaintiff's and other trafficking victims' labor was obtained in violation of 18 U.S.C. § 1589(a) in several ways, including but not limited to the following:

   a. Creating and enforcing a system of spiritual manipulation and coercion whereby Plaintiff and other trafficking victims were led to believe that failure to comply with work requirements would result in spiritual condemnation;

   b. Threatening Plaintiff and other trafficking victims with expulsion from ADC and ASOM if they refused to work, which would have resulted in homelessness and destitution given Plaintiff's isolation from outside support;

   c. Subjecting Plaintiff and other trafficking victims to public humiliation, ridicule, shaming, and verbal abuse when they questioned work requirements or expressed physical exhaustion;

   d. Creating and maintaining complete financial dependency by withholding wages and controlling all aspects of Plaintiff's and other trafficking victims' financial resources;

   e. Implementing a comprehensive system designed to isolate Plaintiff and other trafficking victims from external support networks;

   f. Controlling Plaintiff's and other trafficking victims' access to housing, food, and other basic necessities;

g. Systematically undermining Plaintiff's and other trafficking victims' self-confidence and sense of autonomy through psychological manipulation;

h. Misrepresenting the "volunteer" program as legitimate and legal when it was designed to evade labor laws;

i. Using the structure and status of a religious organization to shield forced labor practices from scrutiny;

j. Characterizing exploitative labor as "volunteer work" to avoid legal requirements regarding minimum wage, working hours, and working conditions;

k. Threatening Plaintiff and other trafficking victims with negative consequences if they reported conditions to authorities;

l. Threating to call the police and report Plaintiff and other trafficking victims as suicidal so the police would detain them at the airport;

m. Threating to file criminal charges against Plaintiff and other trafficking victims for unpaid tuition debt after Plaintiff worked hundreds of unpaid hours at trafficking food service events;

315.  As described more fully herein, all Defendants all received financial benefit from their participation in the venture of forcing Plaintiff to work with threats of harm in violation of 18 U.S.C. § 1589.

316.  All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant knowingly benefitted by receiving revenue and other benefits from its participation in a continuing business venture the Defendant knew or should have known was in violation of the TVPRA.

317.  Each of the Defendants is liable to Plaintiff under the TVRPA because they have all benefited and conspired to benefit from a continuing business venture

in which Plaintiff and other trafficking victims were forced to work through threats of harm in violation of U.S.C. § 1589.

318.   Each Defendant, through the acts and omissions more fully described herein, received a financial benefit from participating in a business relationship in which they recruited, exploited, and manipulated poor, impoverished, and devotedly religious kids and young adults from their local churches and communities around the country, including Plaintiff.

## COUNT FOUR

**(Beneficiary Liability under §1595 (a) of the TVPRA for Violations of 18 U.S.C. § 1590)**
**(Against All Defendants)**

319.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

320.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

321.   Defendants all benefited from a venture in which Plaintiff was recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

322.   Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter."

323.   Defendants violated several chapters of 18 U.S.C. 1581, *et seq.*, as described herein, through their venture to recruit, transport, and harbor Plaintiff and other trafficking victims and to provide them for forced labor.

324.   Defendants violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

a. Creating and disseminating misleading marketing materials that advertised Atlanta School of Ministry as providing legitimate educational opportunities, stating that "students can even choose to get your Bachelors Degree or ministers license" when in fact students received no legitimate degrees and their credits were not transferable to other colleges and universities;

b. Making misrepresentations regarding living conditions, claiming that housing was "all already included in the tuition" and challenging students to "find anywhere that you can live this cheap and experience so much" when in reality students were housed in overcrowded, bedbug-infested, and structurally unsafe facilities;

c. Making misrepresentations regarding food and meals, claiming that "the food gets better and better each year" when in fact students were served expired, moldy, and insect-infested food that regularly caused illness;

d. Misrepresenting that students could "work $1000 off of their tuition" through the trafficking food service events when in fact the value of their labor far exceeded any credit toward tuition, and most students never received proper credit;

e. Misrepresenting that "volunteers" could spread the word of Jesus in a corporate setting at the trafficking food service events when in fact

Plaintiff and other trafficking victims were forbidden from speaking to any attendees at the eventss;

f.  Specifically targeting vulnerable individuals from disadvantaged backgrounds, including those recovering from trauma, addiction, and homelessness;

g.  Partnering with programs like "Out of Darkness" and "Teen Challenge" to identify and recruit individuals with histories of vulnerability who would be susceptible to manipulation and control; and

h.  Using religious and spiritual appeals to induce individuals to join their program, promising spiritual growth and fulfillment while concealing the exploitative labor practices they would face;

i.  Housing Plaintiff and other trafficking victims at all relevant times during which all violations occurred;

j.  Housing Plaintiff and other trafficking victims in unsafe, unsanitary, and overcrowded conditions, including apartments where up to sixteen people shared a single bedroom and bathroom;

k.  Providing housing infested with bedbugs and other pests that caused physical harm to Plaintiff;

l.  Frequently relocating Plaintiff and other trafficking victims between various inadequate housing facilities, including apartments, church basements, camps, and cabins when buildings were condemned or when Defendants failed to pay rent;

m.  Using housing as leverage to ensure compliance with labor demands by threatening Plaintiff and other trafficking victims with expulsion and homelessness if they questioned or refused work assignments;

n.  Prohibiting Plaintiff and other trafficking victims from securing alternative housing or leaving the premises without permission;

o.  Creating living conditions that weakened Plaintiff physically and psychologically, thereby increasing their vulnerability to exploitation;

p.  Transporting Plaintiff and other trafficking victims to various events around Georgia;

q.  Controlling all aspects of Plaintiff's transportation to and from events, maintaining complete authority over their movements;

r.  Arranging transportation in a manner that prevented Plaintiff from leaving independently, often leaving them stranded in unfamiliar locations with no means to return on their own;

s.  Creating and maintaining a systematic arrangement whereby the ADC and MM Defendants provided Plaintiff and other trafficking victims as workers to at trafficking food service events;

t.  Establishing and maintaining financial arrangements that incentivized the continued provision of Plaintiff's and other trafficking victims' labor;

u.  Coordinating and confirming the required number of workers needed for specific events and facilitating their provision;

v.  Coercing Plaintiff and other trafficking victims to provide labor through comprehensive physical, psychological, spiritual, and economic means;

w.  Monitoring and controlling Plaintiff's and other trafficking victims' behavior during work events to ensure continued compliance;

x.  Preventing Plaintiff and other trafficking victims from refusing work assignments or leaving events;

y.  Requiring Plaintiff and other trafficking victims to continue working even after experiencing injuries, illness, or sexual assault;

z.  Refusing to investigate sexual assault allegations that occurred at the trafficking food service events; and

aa. Conspiring to establish quotas and expectations for Plaintiff and other trafficking victims' labor that were physically impossible to meet without severe physical and psychological harm.

325.  As described more fully herein, all Defendants all received financial benefit from their participation in a venture in which Plaintiff was recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

326.  All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, in ways further described herein, each Defendant

knowingly benefitted by receiving revenue and other benefits from its participation in a continuing business venture the Defendants knew or should have known was in violation of the TVPRA.

327.   Each of the Defendants is liable to Plaintiff under the TVRPA because they have all benefited and conspired to benefit from a continuing business venture in which Plaintiff was recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

328.   Each Defendant, through the acts and omissions more fully described herein, received a financial benefit from participating in a business relationship in which they recruited, exploited, and manipulated poor, impoverished, and devotedly religious kids and young adults from their local churches and communities around the country, including Plaintiff.

## COUNT FIVE

### (NEGLIGENCE)
### (AGAINST THE ADC DEFENDANTS)

329.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

330.   At all relevant times, ADC Defendants owed various duties of care to Plaintiff, including, but not limited to:

    a. A duty to exercise ordinary care in keeping the premises safe for invitees under O.G.C.A. § 51-3-1;

b. A duty to provide reasonably safe living conditions, including habitable housing, safe and non-spoiled food, and access to medical care;

c. A duty to exercise reasonable care in the operation and presentation of their educational programs;

d. A duty to exercise reasonable care in supervising Plaintiff and other workers while they were working at jobs controlled and arranged for by the ADC Defendants;

e. A duty to provide accurate and truthful information about the nature and quality of their programs;

f. A duty to implement reasonable safety measures to protect Plaintiff and other residents, students, and workers from foreseeable harms;

g. A duty to properly vet, hire, supervise, and monitor employees, staff, volunteers, and other individuals with access to Plaintiff;

h. A duty to respond appropriately and to investigate reports or suspicions of abuse, misconduct, or unsafe conditions.

331. ADC Defendants knew or should have known of dangerous conditions, hazards, and risks that threatened Plaintiff's wellbeing and caused her harm, including but not limited to:

a. Unsafe and unsanitary housing conditions, including insect infestations, overcrowding, and structural hazards;

b. Contaminated, ruined, and spoiled food that posed serious health risks;

c. Malnutrition and improper diet as shown by Plaintiff's and other victims' rapid and sustained weight loss after arriving at the program;

d. Staff members with histories of misconduct, including sexual abuse and harassment;

e. Prior incidents of sexual harassment, assault, and abuse within their organization;

f. The prevalence of illness and injury among program participants, including Plaintiff;

g. The dangerous and unsafe working conditions and long, arduous working shifts with little to no breaks or opportunities to eat or use the restroom, which would occur on consecutive days, sometimes for weeks at a time;

h. The severe emotional distress and psychological harm suffered by Plaintiff and other program participants as a result of the ADC's negligence and treatment toward them.

332. ADC Defendants knew, or should have known, that they made material misrepresentations to Plaintiff and other program participants that were designed to induce Plaintiff and other program participants to enroll in the ADC Defendants' programs.

333. The ADC Defendants stated: "[o]ur tuition is a bargain! It includes meals, housing, classes, books and even some traveling experiences."

334. In fact, the housing provided was unsafe and unsanitary, the meals consisted of spoiled and contaminated food, the travel was to forced work sites, and the tuition was repaid, in the case of Plaintiff, through forced labor that far exceeded any purported value of the school.

335. The ADC Defendants stated: "[t]he average School of Ministry students eat breakfast, lunch and dinner together in the dining hall at the church…the food gets better and better each year."

336. In fact, Plaintiff was forced to skip several meals while working and was consistently made to serve unsafe and contaminated food to other trafficking victims and to eat it.

337.   The ADC Defendants stated: "[o]ne of the blessings God has given us is…Students have the opportunity to be able to work $1,000 off of their tuition or use that money to fund their foreign mission trip if their tuition is paid off."

338.   In fact, Plaintiff and other trafficking victims were forced to work 14-16 hours shifts at the trafficking food service events, sometimes for weeks at a time, in an illegal peonage scheme under the ADC Defendants took all earned wages and purported to apply them to an undefined tuition amount that never went away;

339.   The ADC Defendants stated: "[a]t our School of Ministry we have many choices…you can even choose to get your Bachelors' Degree or minister's license."

340.   In fact, Plaintiff received no transferrable college credit, degree, or license while in the control of the ADC Defendants.

341.   The ADC Defendants knew these statements were misrepresentations when made or the ADC Defendants made them with reckless disregard for their truth.

342.   The ADC Defendants concealed from Plaintiff material facts about the program, including, but not limited to:

    a.  The history of sexual abuse and misconduct by staff members;

    b.  The true nature of the labor Plaintiff would be required to perform and that she would receive no wages;

    c.  The dangerous and unsanitary conditions of the housing;

    d.  The expired and contaminated nature of the food Plaintiff and other trafficking victims would be forced to eat;

    e.  The lack of accreditation or transferability of the education provided and "credits" earned.

343.  Plaintiff reasonably relied on the ADC Defendants' misrepresentations and material omissions when deciding to enroll in the ADC Defendants' program. Had Plaintiff known the truth, she would never have enrolled.

344.  The ADC Defendants' misrepresentations, along with the continuing fraud and misrepresentations of other defendants as described herein, prevented Plaintiff from discovering the true nature of Defendants' negligence until well after the negligent acts occurred.

345.  Defendants actively concealed the truth from Plaintiff through sustained psychological manipulation and spiritual coercion designed to prevent Plaintiff from recognizing the wrongful nature of the ADC Defendants' actions until well after she left their control.

346.  The ADC Defendants breached their duties of care to Plaintiff in the following ways:

    a.  Negligently misrepresenting the nature, quality, and safety of their programs to induce Plaintiff and other trafficking victims to enroll and to remain enrolled;

    b.  Negligently housing Plaintiff and other trafficking victims in unsafe, unsanitary, and overcrowded housing that posed serious health and safety risks;

    c.  Negligently providing spoiled, contaminated, and nutritionally inadequate food that caused illness and malnutrition;

d. Negligently failing to provide access to necessary medical care when Plaintiff and other trafficking victims were injured or ill;

e. Negligently failing to implement reasonable safety protocols to protect Plaintiff and other trafficking victims from sexual abuse, assault, and harassment;

f. Negligently hiring, retaining, and failing to supervise staff members with known histories of misconduct, including Daniel Palmer, Thomas Palmer, Arthur "Art" Sly, Vince Gord, and others;

g. Negligently allowing Matthew B. Reed to return to the premises while awaiting trial for sexual exploitation of a child;

h. Negligently failing to respond to reports of sexual assault, harassment, and abuse;

i. Negligently failing to protect Plaintiff from unsafe environments, including requiring that she stand on a corner in a high-crime area with a bag of toys, alone;

j. Negligently forcing Plaintiff and other trafficking victims to work excessive hours under dangerous conditions with no breaks to eat, rest, or use the restroom;

k. Negligently fostering an environment that discouraged reporting of abuse, misconduct, and safety concerns;

l. Negligently failing to warn Plaintiff and other trafficking victims of known dangers and risks;

m. Negligently failing to take reasonable measures to prevent foreseeable harms to Plaintiff.

347. The ADC Defendants acted in concert and conspired with other defendants to commit the negligent acts described above.

348. The ADC Defendants and other defendants jointly developed and implemented programs and policies that endangered Plaintiff and other trafficking victims.

349.   The ADC Defendants and other defendants collectively established and paid for living arrangements that they knew or should have known were unsafe and hazardous.

350.   The ADC Defendants and other defendants coordinated their efforts to conceal dangerous conditions and incidents of abuse.

351.   The ADC Defendants and other defendants collaborated and agreed to ignore and dismiss complaints and reports of unsafe conditions, injuries, and misconduct.

352.   The ADC Defendants and other defendants collaborated to manipulate and threaten Plaintiff and other trafficking victims who voiced concerns about their treatment or the conditions.

353.   The ADC Defendants and other defendants conspired to collectively work to maintain the appearance of legitimacy while knowingly exploiting Plaintiff and other trafficking members and exposing them to serious harm.

354.   The ADC Defendants' conspiracy, along with that of the other defendants, to maintain the appearance of legitimacy prevented Plaintiff from discovering the true nature of their wrongful acts and conspiracy.

355.   As a direct and proximate result of the ADC Defendants' negligence, including their conspiracy to commit negligent acts, Plaintiff suffered physical, emotional, and financial injuries.

## COUNT SIX

## (BREACH OF FIDUCIARY DUTY)
## (AGAINST THE ADC DEFENDANTS)

356.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

357.   The ADC Defendants stood in a fiduciary relationship to Plaintiff who was entrusted to their care, supervision, and control.

358.   The fiduciary relationship between Plaintiff and the ADC Defendants arose when the ADC Defendants solicited, assumed, and maintained complete control of Plaintiff's spiritual and physical life through coercion and manipulation.

359.   The ADC Defendants assumed a fiduciary role through several ways, including, but not limited to, the following:

   a. Assuming and maintaining the position of Plaintiff's religious and spiritual leader, counselor, and advisory, and exercising total religious and spiritual authority over Plaintiff;

   b. Assuming and maintaining complete control over nearly every other aspect of Plaintiff's life, including but not limited to housing, education, work, finances, medical care, access to food, quality and safety of food, hygiene, sleep, ability to communicate with people both inside and outside the organization, and content of said communications;

   c. Inducing, coercing, and manipulating Plaintiff into placing a special trust and confidence in them through their control of Plaintiff's spiritual and religious beliefs, education, medical care, personal relationships, life plans, and needs;

   d. Systematically breaking down Plaintiff's emotional independence, though such acts as inducing and requiring Plaintiff to disclose intimate embarrassing, and traumatic details, including details of a prior sexual

trauma, and through such admission manipulating her into falsely accepting emotional responsibility for the sexual molestation.

360. Plaintiff was particularly vulnerable as a young adult with an untreated history of trauma who was isolated from her family and support system and who was completely dependent upon ADC Defendants for all of her needs.

361. The ADC Defendants created and maintained this dependence and used it as a coercive tool to keep Plaintiff in the program, working for their financial benefit, and to keep her from questioning her circumstances.

362. The ADC Defendants exercised control over Plaintiff's ability and desire to leave the program and thus ensured their continuing control over her through emotional, spiritual, and religious manipulation; false statements; and threats.

363. Plaintiff placed complete trust and confidence in the ADC Defendants because she was a person of strong religious conviction and because the ADC Defendants assumed and maintained the role of her exclusive spiritual counselors and advisors.

364. As fiduciaries, the ADC Defendants owed Plaintiff duties of utmost good faith, loyalty, full disclosure, and care that required them to place Plaintiff's interests above their own.

365. The ADC Defendants breached their fiduciary duties to Plaintiff in several ways, including, but not limited to the following:

a. Mispresenting the nature, quality, and safety of the programs and services offered by the ADC Defendants and their affiliated organizations when they knew, or at least should have known, those representations to be false;

b. Exploiting their position of trust, confidence, and authority to coerce Plaintiff into providing uncompensated labor;

c. Misappropriating wages from Plaintiff by having payment for jobs Plaintiff worked sent directly to Mission under an illegal peonage scheme to pay off an alleged and undefined tuition debt;

d. Using their acquired spiritual authority to manipulate and control Plaintiff through fear, shame, and religious coercion;

e. Placing their own financial interests above Plaintiff's welfare by providing unsafe housing, contaminated and unsafe food, and inadequate medical care;

f. Failing to disclose to Plaintiff material information about the true nature of their programs, the backgrounds of staff members with histories of misconduct and abuse, and the dangers present in the housing and working environments that they controlled;

g. Abusing their position of trust to subject Plaintiff to public humiliation, extreme emotional distress, physical injury, sexual assault, sexual harassment, and other forms of mental and physical abuse; and

h. Ignoring and manipulating Plaintiff's reactions to said circumstances by repeatedly telling her it was God's will and then threatening her with financial and legal consequences.

366. The ADC Defendants' breach of their fiduciary duties to Plaintiff was intentional, premediated, wanton, and with extreme disregard to Plaintiff's wellbeing.

367. The ADC Defendants acted in concert and conspired with each other and with other named Defendants to breach their fiduciary duties to Plaintiff in several ways, including, but not limited to, the following:

a. Developing and implementing a common scheme to exploit Plaintiff's trust and confidence in order to obtain her labor and secure financial benefits;

b. Deliberately creating institutional structures and messaging designed to foster and exploit dependency and to inhibit Plaintiff and other program members from challenging or questioning abusive treatment, illegal activities, and unsafe and inhabitable conditions;

c. Collectively establishing and enforcing rules and practices intended to isolate Plaintiff and other victims from outside support and resources, and from reporting concerns and abuse to others;

d. Jointly crafting, implementing, communicating, and maintaining false narratives about the nature and purpose of their programs to recruit and retain vulnerable individuals, like Plaintiff;

e. Establishing a pattern of communication, coordination, and mutual support to perpetuate their exploitation of Plaintiff and other victims;

f. Agreeing, to this day, to conceal each other's misconduct, to deny all allegations against themselves and others, and to present a unified front against any who questioned the program or their illicit behavior.

368.    Plaintiff completely relied on the ADC Defendants' misrepresentations, fraudulent statements, threats, and religious/spiritual coercion and manipulation and was unable to discovery their breach and conspiracy because of her reasonable reliance.

369.    As a direct and proximate result of the ADC Defendants' breach of their fiduciary duties, including their conspiracy to breach these duties, Plaintiff suffered and continues to suffer physical, financial, and emotional injuries.

## **COUNT SEVEN**

### **RESPONDENT SUPERIOR/VICARIOUS LIABILITY**
### **(Against all Defendants)**

370.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

371.   At all times relevant herein, Daniel Palmer and other co-conspirators were acting within the course and scope of his role as a member of AOG, ADC, and ASOM and was supervised in this role by the Defendants; therefore, Defendants are liable for Daniel Palmer and other co-conspirator's negligent acts under the theories of respondeat superior, agency, and vicarious liability.

372.   At all times relevant herein, Daniel Palmer and other co-conspirators were acting within the course and scope of his role as an agent and member of the Defendants' organizations. Each of the Defendants acted through agency, joint venture and/or common enterprise when they exposed Plaintiff and other victims to the abuse of Daniel Palmer and other co-conspirators and had the right to exercise mutual control over Plaintiff, making them jointly and severally liable for the acts alleged.

## COUNT EIGHT

### BREACH OF FIDUCIARY DUTY
### (Against all Defendants)

373.   Each of the Defendants exercised a controlling influence over the will, conduct, and interest of Plaintiff, such that the law required the utmost good faith from the Defendants in safeguarding Plaintiff from known dangers.

374.   Each of the Defendants, by and through their agents, employees, and volunteers, failed to take remedial measures to protect Plaintiff from Daniel Palmer and other co-conspirators, despite having superior knowledge of the danger posed to Plaintiff by them.

375.   Each of the Defendants had a special relationship of trust with Plaintiff, and as such, owed a fiduciary duty to them for their health, safety, and well-being.

376.   Each of the Defendants breached their fiduciary duties to Plaintiff by failing to provide for her health, safety, and well-being, exposing her to traffickers and/or predators, fostering an environment of inappropriate emotional and physical contact, and concealing the known dangers at ADC/ASOM.

377.   Each of the Defendants, by and through their agents, employees and volunteers breached the fiduciary duty owed to Plaintiff. As the direct and proximate result of Defendants' breach of this fiduciary duty, Plaintiff suffered damages for which she is entitled to recover as provided by law.

## **DAMAGES**

378.   The Defendant's acts and omissions, individually and collectively, caused Plaintiff to sustain legal damages.

379.   The Defendants are jointly and severally liable for all past and future damages sustained by Plaintiff.

380.   Plaintiff is entitled to be compensated for personal injuries and economic damages, including:

    a.    Actual damages;

    b.    Direct damages;

    c.    Incidental and consequential damages;

    d.    Mental anguish and emotional distress damages (until trial and in the future);

    e.    Lost earning capacity in the future;

    f.    Loss of self-esteem and self-worth;

    g.    Necessary medical expenses;

    h.    Physical pain and suffering;

    i.    Physical impairment;

    j.    Emotional impairment;

    k.    Unjust enrichment; and

    l.    Penalties.

381.   Plaintiff is entitled to exemplary damages.

382.   Plaintiff is entitled to recover attorneys' fees and costs of court.

383.   Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

384.   A constructive trust should be imposed on Defendants and the Court should sequester any benefits or money wrongfully received by the Defendants for the benefit of Plaintiff.

## JURY TRIAL

385.   Plaintiff demands a jury trial on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. That process issue according to law;

B. That Defendants be served with a copy of Plaintiff's Complaint and show cause why the prayers for relief requested by Plaintiff herein should not be granted;

C. That the Plaintiff be granted trial by jury;

D. That the Court enters judgment against Defendants for all general and compensatory damages allowable to Plaintiff;

E. That the Court enters judgment against Defendants for all special damages allowable to Plaintiff;

F. That the Court enters a judgment against Defendants serving to award Plaintiff punitive damages under the provisions of O.C.G.A. § 51-12-5.1;

G. That Plaintiff recovers all possible damages for loss of consortium;

H. That Plaintiff recovers all possible damages for Plaintiff's injuries and pain and suffering;

I. That the Court enters judgment against Defendants for all other relief sought by Plaintiff under this Complaint;

J. That the cost of these actions be cast upon Defendants;

K. That the Court grant Plaintiff such further relief which the Court deems just and proper.

Dated: April 14, 2025

Respectfully submitted,

**/s/: M. Brandon Smith**
M. Brandon Smith
Georgia Bar No. 141418
C. Andew Childers
Georgia Bar. No. 124398
CHILDERS, SCHLUETER & SMITH, LLC
1932 N. Druid Hills Road, Suite 100
Atlanta, Georgia 30319
 (404) 419-9500
(404) 419-9501 (Fax)
bsmith@cssfirm.com
achilders@cssfirm.com

Kimberly Dougherty, Esq., (*pro hac vice to be filed*)
Laura Yaeger, Esq. (*pro hac vice to be filed*)
Keith Smith, Esq. (*pro hac vice to be filed*)
Justice Law Collaborative, LLC
210 Washington St.
North Easton, MA 02356
(508) 230-2700
kim@justicelc.com
laura@justicelc.com
keith@justicelc.com

*Counsel For Plaintiff*

## **CERTIFICATE OF COMPLIANCE**

Under Local Rules 5.l(C) and 7. l(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

/s/: M. Brandon Smith
M. Brandon Smith
Georgia Bar No. 141418
CHILDERS, SCHLUETER & SMITH, LLC
1932 N. Druid Hills Road, Suite 100
Atlanta, Georgia 30319
(404) 419-9500
(404) 419-9501 (Fax)
bsmith@cssfirm.com
