**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| JANE DOE K.D.,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL COUNCIL OF THE ASSEMBLIES OF GOD, GEORGIA DISTRICT COUNCIL ASSEMBLIES OF GOD, INC., and JOHN DOES 1-50,<br><br>Defendants. | CIVIL ACTION NO.<br>1:25-cv-02028-WMR |

# ORDER

Jane Doe K.D. sues the General Council and the Georgia District Council of the Assemblies of God, bringing five claims against them for alleged violations of the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595(a), and two claims under Georgia law. Doe alleges that a man named Daniel Palmer,[1] who is not a defendant in this lawsuit, ran a missionary program that coerced prospective and active missionaries in the program into forced labor. She alleges Daniel (or someone on his behalf) promised her that she could one day become a minister through his missionary program. All she had to do in return was

[1] Because Doe's Second Amended Complaint contains allegations of fact about multiple Palmers (Daniel and his dad, Paul), the Court will refer to each respective Palmer by his first name.

move from Missouri to Georgia, join the program, incur some debt to pay for tuition and other expenses, and volunteer to work for free to pay off the debt.

But, Doe alleges that Daniel's promise of becoming a minister through the program was illusory. And, she alleges that the missionary program he ran was really a labor trafficking organization, wherein missionaries—including herself—worked for free to pay down a debt that Daniel's organization would never count as satisfied. And, on top of that, she alleges that the missionaries, again herself included, lived and worked in deplorable conditions. Doe alleges that Daniel ran the missionary organization with the help of an Atlanta-based church, a missionary school, and an anti-trafficking missionary program. Though many of those organizations were once named as defendants in this action, they've all since been voluntarily dismissed. Daniel has never been named as a defendant here.

The only remaining defendants here, then, are the General Council and Georgia District Council of the Assemblies of God—"the national and regional governing bodies of one of the largest Pentecostal denominations in the United States." Doc. 100 ¶ 3. Doe alleges that the General Council and Georgia District Council gave Daniel a ministerial credential, the fact on which Doe's theory of liability rests. Because they gave Daniel that ministerial credential, so Doe's theory goes, they should be on the hook for his alleged labor trafficking venture, too (as alleged beneficiaries of it).

The General Council and the Georgia District Council move to dismiss the Second Amended Complaint. The General Council contends that the Court does not have personal jurisdiction over it because it is a Missouri organization that has insufficient contacts with Georgia. And, both Councils contend that they cannot be liable for Daniel's actions without additional allegations showing that he either acted as their agent when he ran the trafficking venture or that they knowingly participated in it.

As explained further below, the Court agrees with the General Council and the Georgia District Council on both points. *First*, the Second Amended Complaint—which was filed after a 60-day jurisdictional discovery period—does not contain sufficient allegations to show that the Court has personal jurisdiction over the General Council. *Second*, the Second Amended Complaint falls short of sufficiently alleging that the Georgia District Council could be liable for Daniel's alleged labor trafficking conduct. For these reasons, and the reasons that follow, the Court **GRANTS** the Motions to Dismiss, Docs. 101, 102.

## I. BACKGROUND

### A. The General Council and District Council

The Assemblies of God is "one of the largest Pentecostal denominations in the United States." Second Amended Complaint (SAC), Doc. 100 ¶ 3. The General Council of the Assemblies of God (General Council) and the Georgia District

Council of the Assemblies of God, Inc. (Georgia District Council) are "the national and regional governing bodies" of the Assemblies of God. *Id.* The General Council is a Missouri nonprofit organization, and the Georgia District Council is a Georgia nonprofit organization. *Id.* ¶¶ 18–19.

Prospective ministers seeking to affiliate themselves with the Assemblies of God must apply to the General Council for ministerial credentials, and in some cases, the General Council may itself grant or deny those applications. *Id.* ¶¶ 291–293, 302. For clergy applications from Georgia, however, the General Council has delegated to the Georgia District Council the responsibility "to examine, approve and recommend candidates" ministerial credentials. *Id.* ¶ 286. The General Council has also delegated to the Georgia District Council the authority "to investigate and discipline ministerial misconduct" in Georgia. *Id.* ¶ 333. Notwithstanding those delegations, the General Council retains "final authority to reject any [prospective minister] that [the Georgia District Council] recommended." *Id.* ¶ 292.

### B. Daniel Palmer's Application Process

Daniel Palmer applied to be an Assemblies of God minister in 2011. *Id.* ¶ 301. In that application, Daniel allegedly admitted to previous sexual misconduct. *Id.* ¶ 303. He also admitted to having engaged previously in "sinful behavior." *Id.* ¶ 305. As part of the processing of Daniel's application, the Councils ran a background check on him, which included his financial history. *Id.* ¶ 306.

Daniel's application process also included an Assemblies of God licensing examination. *See id.* ¶ 309. During that examination, he allegedly told the Councils that he ran a non-profit (referred to by Doe as "The Foundation") that had raised $1.2 million in 2010. *Id.* ¶¶ 310–11. Despite Doe's allegations that The Foundation's actions in raising those funds somehow violated Assemblies of God bylaws, *see id.* ¶¶ 312–22, she does not allege that the Councils were made aware (at the time of Daniel's application process) that the funds were raised through labor trafficking. Similarly, while Doe alleges that the Councils could have uncovered that Daniel had raised that money in part thanks to unpaid (or volunteer) labor, she does not specifically allege that any of that unpaid labor had been unlawfully coerced. *See id.* ¶¶ 311–36. The Georgia District Council ultimately approved Daniel's application, and he became an Assemblies of God credentialed minister in 2012. *See id.* ¶ 28.

### C. The Palmers' Various Organizations

After Daniel received his ministering credentials, Daniel and Paul Palmer "recruited students to join several entities they operated in Atlanta." *Id.* ¶ 6. Those entities included: a church in Atlanta founded by Paul in 2003, *see id.* ¶¶ 6, 25; the missionary school founded by Daniel, *see id.* ¶¶ 6, 29; and an anti-trafficking missionary program formed by Paul, *see id.* ¶¶ 6, 27.

The church in Atlanta was allegedly affiliated with both the General Council and Georgia District Council of the Assemblies of God. *See id.* ¶ 26. The missionary

school founded by Daniel "exclusively taught" Assemblies of God religious doctrine and partnered with the Georgia District Council to offer courses to students who were seeking Assemblies of God ministerial credentials. *Id.* ¶¶ 29–30, 39–41, 124. Doe alleges that these three entities "functioned as one" while she was affiliated with them. *Id.* ¶ 35. (For ease of reference, the Court refers to these three entities collectively as the "Palmer Entities.")

Daniel also founded and ran a nonprofit organization referred to as "The Foundation," which "contracted with commercial partners to provide labor at corporate and sporting events, conferences, concerts" and at Assemblies-of-God-affiliated "churches, events, conferences, retreats, festivals and programs." *Id.* ¶¶ 62, 64.

**D. Doe's Allegations Against Daniel Palmer and the Palmer Entities**

This is how Doe says Daniel Palmer's alleged trafficking scheme worked. His missionary school would charge students tuition to cover "housing, food, travel[,] and its purported missionary training and ministerial coursework." *Id.* ¶ 36. The majority of the students could not afford the tuition on their own, though, so, students were encouraged to fundraise from their local churches. *Id.* ¶¶ 43–44. Inevitably, some students would be unable to raise enough funds to cover the entire tuition—so, Daniel's missionary school would present those students with "a tuition invoice and debt when they arrived [at the missionary school], and require[] [them] to sign

oppressive debt promissory agreements that threatened severe financial penalties and legal action if the students did not repay the purported tuition debt." *Id.* ¶ 45. "To repay the alleged tuition debt, the [Palmer Entities] forced students to work unpaid jobs at commercial catering and sporting events; to perform unpaid labor at [General Council and Georgia District Council] churches, camps, retreats, festivals, conferences, and events; and to perform unpaid labor" at Paul's Atlanta church and his anti-trafficking organization. *Id.* ¶ 46. According to Doe, no matter how much unpaid work a student did, it was never enough to satisfy the "inexhaustible and never-ending tuition debt." *See id.* ¶¶ 9, 44, 486.

The Palmer Entities "forced students to work unpaid and fundraise for 14–16-hour days, sometimes for several days in a row, without rest or meal breaks." *Id.* ¶ 56. And the Entities "forced students to sleep in vans, hallways, doorways, and on church pews and floors." *Id.* ¶ 57. They also "coerced students into working and accepting their conditions by telling them their unpaid labor and working conditions were the will of God. Daniel Palmer personally told Plaintiff, and other students, that God spoke through him, and that to deny him was to deny God." *Id.* ¶¶ 59–60.

As for Doe herself, she moved from Missouri to Atlanta in 2014 or 2015 to become a missionary with the Palmer Entities after being recruited to join Daniel's missionary school. *See id.* ¶¶ 98–99. Some members of the missionary school performed for her youth group in Missouri and invited her to come on board. *See id.*

The members of Daniel's missionary school "represented to [Doe] that joining [the Palmer Entities] would allow her to earn Assemblies of God ministerial credentials and do missionary work under Assemblies of God pastors." *Id.* ¶ 99.

Doe "understood that volunteering would be part of her missionary work." *Id.* ¶ 102. But, what she did not anticipate was that she'd be asked to volunteer as a caterer or perform various unpaid tasks for Paul's "Anti-Trafficking Venture, other Assemblies of God churches, [or] at Assemblies of God events, conferences, retreats, camps, and festivals." *See id.*

The Palmer Entities forced Doe "to prepare and serve meals for her fellow students under deplorable conditions." *Id.* ¶ 159. They made her "work in their kitchen nearly every day, for 8-10 hours per day. All of this work was unpaid, and was never credited to Plaintiff's [missionary] tuition debt." *Id.* ¶ 158.

The Palmer Entities also made Doe and the other students work for free at various, unidentified, events across Georgia and out of the state. They forced the students to sign "character contracts," wherein Doe and the other students "would be abandoned and left at events, including those that were out of state, with no way home, no money, and no phone if [she] or other students did not work hard or faked being sick." *Id.* ¶ 173. The Palmer Entities would not let her take breaks or even use the restroom. *See id.* ¶ 181. At one event, Doe was sexually assaulted—but, the

Palmer Entities told her the assault "was her fault and prohibited her from reporting the assault to anyone else." *Id.* ¶¶ 201–02.

Doe felt "trapped" by her situation. *See id.* ¶ 153. She says the Palmers forced her to spend all her time doing unpaid labor—in fact, they actively prevented her from having a paying job. *See id.* ¶ 115. Additionally, the Palmer Entities, "including Daniel Palmer, routinely threatened students . . . against leaving. The threats included legal action for purported unpaid debts, calling the police, calling their parents and home churches to disparage them, and ostracizing them from the Assemblies of God parishioner community." *See id.* ¶ 155.

Because of the horrible conditions in which Doe found herself, she met with Daniel and told him "that her mental health was suffering and that she wanted to temporarily return home to reconnect with a therapist and doctor." *Id.* ¶ 214. She revealed that "she was self-harming as a result of her mental deterioration." *Id.* Incredibly, "Daniel Palmer pulled up her shirt sleeves and called her a liar. He accused her of faking mental distress to leave [his mission organization]." *Id.* ¶ 215. He told her that she was not allowed to leave. *Id.* ¶ 219. Doe "was ultimately forced to leave [the Palmer Entities] in the middle of the night given how fear-stricken she was over leaving." *Id.* ¶ 221.

After Doe left the Palmer Entities behind, a Palmer Entities employee contacted her and "insisted [she] still owed money for tuition." *Id.* ¶ 229. Despite

the hundreds of unpaid hours she told him she had worked, the employee "insisted that she owed her full tuition balance." *Id.* He "threatened to sue her, to file criminal charges, and informed [her] she would go to prison if she did not pay the debt in full." *Id.* ¶ 230.

### E. The Councils Investigate Daniel Palmer

In 2020, a group of former missionary students signed a petition requesting that the General Council investigate Daniel Palmer and his missionary program. *Id.* ¶ 447. Among other things, the petition described "the grueling labor requirements, religious coercion, . . . hazing, [and] tuition debt" in Daniel's program. *Id.* ¶ 448. And, it outlined the missionaries' unsafe living conditions and unsafe food. *Id.* ¶ 449.

The Georgia District Council conducted an investigation into the reports and recommended that the General Council not renew Daniel's credentials for 2021. *Id.* ¶ 461. The General Council accepted the Georgia District Council's recommendation, did not renew Daniel's credentials in 2021, and informed him that he was to stop marketing his missionary program as being affiliated with the General Council or Georgia District Council. *Id.* ¶¶ 461–62.

### F. Procedural History & the Councils' Alleged Knowledge of the Palmers' Trafficking Venture.

Doe first filed this lawsuit in April 2025. Doc. 1. One week after her initial filing, she amended her complaint. Doc. 20. The General Council moved to dismiss

the First Amended Complaint for lack of personal jurisdiction and for failure to state a claim. *See* Doc. 54. The Georgia District Council moved to dismiss for failure to state a claim. *See* Doc. 55.

Following a hearing on the motions to dismiss, the Court allowed "60 additional days from [the date of the hearing] for plaintiff to engage in jurisdictional discovery (1) to determine if there is any evidence that [Daniel] Palmer acted as the agent of either the General Council or the Georgia District Council; and (2) to investigate reports made to the General Council or the Georgia District Council about Palmer's alleged conduct." Doc. 80.

Based on the discoveries made during the 60-day jurisdictional discovery period, Doe moved to amend her complaint for a second time—which the Court allowed. Doc. 99. The Councils have moved to dismiss Doe's Second Amended Complaint for similar reasons to their first motions. In addition to the General Council's personal jurisdiction argument, they both argue that they are not liable for the Palmer Entities' misdeeds because they did not have the requisite knowledge or relationship with the Entities for liability. Docs. 101, 102.

Doe disagrees. She points to the following allegations as establishing that the Councils had a sufficiently close relationship with, and knowledge of the alleged trafficking enterprise run by, the Palmer Entities.

- The Georgia District Council reviewed and recommended that the General Council approve Daniel's application for ministering credentials in 2011, which included admissions of previous sexual misconduct and fundraising accomplishments. SAC ¶¶ 303–04, 309–12.
- Daniel became an Assemblies of God minister in 2012 and directed an Assemblies-of-God-affiliated ministry school. *Id.* ¶¶ 4, 6, 7.
- Paul's Atlanta-based church was "an Assemblies of God church"—meaning it was "led by [General Council]/[Georgia District Council]-credentialed ministers and pastors, and it was [General Council]/[Georgia District Council] affiliated while [Doe] was there." *Id.* ¶ 26.
- The Councils renewed Daniel's credentials every year from 2012 until 2020. *Id.* ¶ 134.
- The Assemblies of God Bylaws and Constitution included an obligation to investigate ministerial and church misconduct. *Id.* ¶¶ 300, 324, 331, 333, 337–74.
- Daniel's missionary students provided "manual unpaid labor to assist with setup, breakdown, and clean up" and "data entry" at "official Assemblies of God events, conferences, and retreats." *Id.* ¶¶ 52, 54, 474.

- The Georgia District Council's then-Youth Director posted photographs to his personal Instagram account in 2014–16 thanking Daniel's missionary students for their volunteer work. *Id.* ¶¶ 393–96. He also gave the students "pep talks" to encourage the students. *Id.* ¶ 401.
- At one volunteer event in 2014 or 2015, a missionary student told the same Youth Director that they had "slept just '3 hours a night' on the floor in between labor shifts at a 3-week working event for [Palmer Entities]"; that the students "would often scrape caviar off of plates headed to the trash"; and that "they were not paid for their work at the event." SAC ¶ 260. The Youth Director allegedly laughed in response and did nothing to show his disapproval of their conditions. *See id.* ¶ 261.

## II. LEGAL STANDARD

For the purposes of deciding these motions to dismiss, the Court "take[s] the allegations of the complaint to be true." *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1198–99 (11th Cir. 2012). But, "the complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 1199 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To that end, "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Id.* Similarly, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "Determining whether a complaint states a plausible claim for relief . . . requires the reviewing court to draw on its judicial experience and common sense." *Id.* In addition, the complaint must contain enough facts for the Court to "infer more than the mere possibility of misconduct." *Id.*

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010). "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.* (quotation marks omitted). "[I]f the defendant makes a showing of the inapplicability of the long-arm statute, 'the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint.'" *Id.* (quoting *Polskie Linie Oceaniczne v. Seasafe Transport A/S*, 795 F.2d 968, 972 (11th Cir. 1986)).

## III. DISCUSSION

The Court discusses first the General Council's motion to dismiss for lack of personal jurisdiction. After that, the Court analyzes both Councils' arguments in favor of dismissal for failure to state a claim.

### A. The General Council's Rule 12(b)(2) Motion

Federal courts conduct a two-step personal jurisdiction analysis. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626–27 (11th Cir. 1996). First, a court analyzes whether the plaintiff has alleged sufficient facts in the complaint to subject the non-resident defendant to the forum state's long-arm statute—here, that's Georgia. *See id.* Second, if the court determines that the forum state's long-arm statute is satisfied, the court must then determine whether the exercise of personal jurisdiction comports with constitutional due process. *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1272 (11th Cir. 2022).

#### *1. Georgia's Long-Arm Statute Analysis*

Georgia's long-arm statute allows the Court to exercise personal jurisdiction over a nonresident defendant who, "in person or through an agent," (1) transacts business within the state; (2) commits tortious acts or omissions within the state; (3) commits tortious injuries within the state via out-of-state acts or omissions if the defendant regularly conducts business in the state; or (4) owns or uses property within the state. O.C.G.A. § 9-10-91. "The Georgia long-arm statute confers

personal jurisdiction over nonresidents to the maximum extent permitted by due process." *Fenster v. Int'l Ventures, Inc.*, 929 S.E.2d 865, 868 (Ga. Ct. App. 2026) (quotation marks omitted).[2]

The General Council argues that this Court does not have personal jurisdiction over it. Doc. 102-1 at 12–18. As the Eleventh Circuit permits, it has submitted evidence in support of its argument in the form of an affidavit and its Constitution and Bylaws. *See Diamond Crystal Brands*, 593 F.3d at 1257. It contends that the following evidence rebuts any prima facie showing of personal jurisdiction: (a) the General Council has no employees in Georgia and does not transact business in the state, Doc. 102-1 at 19 (citing Doc. 102-2 ¶¶ 4, 15–25); (b) the General Council does not own any property in the state, *id.* (citing Doc. 102-2 ¶ 21); (c) "the churches, ministries, and individual ministers who affiliate with the General Council are independent and sovereign actors who are not controlled by the General Council in any respect outside of church doctrine," *id.* (citing Doc. 102-2 ¶¶ 5–14, 25); (d) the "General Council only persistently acts in Missouri," *id.* at 14 (citing Doc. 102-2 ¶¶ 5–14, 25); and (e) "the General Council does not derive *any* revenue from goods used or consumed or services rendered in this state," *id.* (citing Doc. 102-2 ¶ 32).

[2] "Federal courts are bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Polskie*, 975 F.2d at 790 (quotation marks omitted).

Doe responds by pointing back to the allegations in her complaint. *Cf. Polskie*, 795 F.2d at 972 ("[T]he plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint."). The only prong of Georgia's long-arm statute that she argues applies here is the tort or omissions prong. *See* Doc. 105 at 14–17; O.C.G.A. 9-10-91(2). In other words, she contends that the General Council falls within the grasp of Georgia's long-arm statute because it acted through the Georgia District Council, Daniel Palmer, and the Palmer Entities (as its alleged agents) to commit tortious acts and omissions in Georgia. *See* Doc. 105 at 14–17; *see also* O.C.G.A. § 9-10-91. It's important to keep in mind throughout this analysis that the tortious act alleged in Doe's Second Amended Complaint is forced and/or coerced labor.

Doe says that the following allegations in the Second Amended Complaint show that the Georgia District Council, Daniel Palmer, and/or the Palmer Entities perpetuated the forced labor scheme as agents of the General Council. First, "Georgia resident Daniel Palmer was an agent" of the General Council. Doc. 105 at 15 (citing SAC ¶¶ 6, 8). Second, Paul's Atlanta-based church was "affiliated" with the Assemblies of God. *Id.* (citing SAC ¶ 26). Third, the Georgia District Council is "a domestic nonprofit registered to do business in the state of Georgia" and was the General Council's "agent in Georgia for credentialing, investigating, disciplining,

and restoring ministers, and investigating and disciplining churches." *Id.* (citing SAC ¶¶ 19, 375–79). And, fourth, "[t]he [Second Amended Complaint] details the [alleged TVPRA violations] from [the General Council's] agents Daniel Palmer and his [Entities] as well as [the Georgia District Council], which constitute torts." *Id.*

None of those allegations shows that Daniel Palmer, the Palmer Entities, or the Georgia District Council forced or coerced Doe into labor *on behalf of* (i.e., as an agent of) the General Council. The first and fourth allegations are conclusory statements of law that cannot overcome the General Council's contrary evidence that it has no right to control the day-to-day actions of affiliated ministers or churches. *See* Doc. 102-2 ¶¶ 5–14, 25; *see also Iqbal*, 556 U.S. at 678; *Diamond Crystal Brands*, 593 F.3d at 1257; *Brandenburg v. City of Vidalia*, 880 S.E.2d 625, 634 (Ga. Ct. App. 2022) (no personal jurisdiction where the out-of-state principal "had no right to exercise control over the time, manner, and method" of the alleged agent's work in Georgia).

The second allegation—that Paul Palmer's church was "affiliated" with the General Council—does not establish that the church was acting on behalf of the General Council, as its agent, when it allegedly perpetuated Daniel's labor trafficking scheme. The General Council has submitted evidence showing that it does not control "churches, ministries, and individual ministers who affiliate with the General Council" because they "are independent and sovereign actors who are

not controlled by the General Council in any respect outside of church doctrine." Doc. 102-2 ¶¶ 5–14, 25; *see Brandenburg*, 880 S.E.2d at 634 (no personal jurisdiction where the out-of-state principal "had no right to exercise control over the time, manner, and method" of the alleged agent's work in Georgia). Doe merely points back to her Second Amended Complaint (which she submitted after a 60-day jurisdictional discovery period) in an attempt to rebut the General Council's evidence. Doc. 105 at 14–17. Because she has not "substantiate[d] jurisdictional allegations in the complaint by affidavits or other competent proof, and [has] merely reiterate[d] the factual allegations in the complaint," she has failed to carry her burden of showing that the General Council controlled Daniel Palmer or his father's church to the extent necessary for the Court to find that they were its agents in Georgia. *See Diamond Crystal Brands*, 593 F.3d at 1257; *Polskie*, 795 F.2d at 972.

Similarly, the third allegation—that the Georgia District Council was registered to do business in Georgia and acted on the General Council's behalf in credentialing, investigating, and disciplining ministers in Georgia—does not establish that the Georgia District Council allegedly perpetuated Daniel's labor trafficking scheme on behalf of the General Council. As explained in more detail below, *see infra* at 33–43, there is no allegation that the Georgia District Council had knowledge of (or reason to know of) Daniel's alleged *forced or coerced* labor regime until 2020—at which time it acted promptly and recommended that Daniel's

credentials not be renewed the next year. *See* SAC ¶¶ 461–62. Accordingly, there is no act or omission of the Georgia District Council that would subject the General Council to the jurisdiction of a Georgia court for Daniel's actions in 2014–16.[3] *See* O.C.G.A. § 9-10-91(2); *Brandenburg*, 880 S.E.2d at 634; *Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank of Ames*, 620 S.E.2d 352, 354 (Ga. 2005).[4]

Doe also argues that the General Council's own actions (as opposed to its alleged agents' actions) subject it to the Georgia long-arm statute. Doc. 105 at 17. She points to the following allegations as establishing jurisdiction over the General Council: (1) the allegation that she was "trafficked at . . . official [General Council] . . . conferences, camps, retreats," *id.* (quoting SAC ¶ 13 and citing SAC ¶¶ 46, 52–54, 243); and (2) the allegation that the General Council "organiz[ed] Plaintiff and

---

[3] Though it's not binding on this Court, the 1997 Eighth Circuit decision, *Alford v. United States*, helps drive this point home. 116 F.3d 334 (8th Cir. 1997). There, the Eighth Circuit reversed a district court's finding that an Assemblies of God credentialed minister was an agent of the General Council based in part on his credentialed status and his church's affiliation with the General Council. Very similar to the facts uncovered in jurisdictional discovery here, there, the court found important that the General Council: (1) had "*no* right to control" the church that the minister led; (2) could not guarantee him a job at any church; (3) could not have fired him from the church he led; (4) did not evaluate his performance as a pastor; and (5) did not perform any evaluation to determine whether his credentials should be renewed. *Id.* at 339. While the minister could have been found to be an agent of the *church* he led, the court held that he was not an agent of the national credentialing organization because it did not have adequate control over his day-to-day actions. *See id.* Even though the *Alford* decision is not binding (and distinguishable in some immaterial regards), the Court finds its agency discussion and analysis to be helpful.

[4] Doe does not contend that the Court has jurisdiction over the General Council by way of its alleged ratification of the labor trafficking scheme. *See* Doc. 105 at 14–17. But, for the reasons explained below, *see infra* at 49, that argument would be unavailing. There's simply no allegation that plausibly shows that either Defendant ratified the unlawful acts here.

other laborers to be transported from Georgia to [General Council] events to work unpaid," *id.* (citing SAC ¶¶ 52–54).

Neither argument establishes personal jurisdiction *in Georgia*. Nothing in the paragraphs she cites (13, 46, 52, 53, 54, and 243) specifically alleges that the *General Council* held any official "conferences, camps, [or] retreats" in Georgia—let alone suggests that Doe herself worked at any of them. The Court reads Georgia's long-arm statute "literally," as it must. *See Diamond Crystal Brands*, 593 F.3d at 1259. And, the statute requires the defendant to commit the tort *within the state* to fall within subsection (2)'s grasp. *See* O.C.G.A. § 9-10-91(2) (requiring the defendant to "[c]ommit[] a tortious act or omission within this state").

While the statute does include a subsection for torts committed outside the state, it confines jurisdiction in such cases to when "the tort-feasor *regularly* does or solicits business, or engages in any other *persistent* course of conduct, or derives *substantial* revenue from goods used or consumed or services rendered in this state." *Id.* § 9-10-91(3) (emphasis added). Doe does not challenge the General Council's evidence showing that it does not regularly do any of those things. *See* Doc. 102-2 ¶¶ 4, 15–25, 32; Doc. 105 at 15–17 (not challenging the General Council's evidence on this point). Because the General Council has presented unrebutted evidence showing that it does none of those things in Georgia, it does not fall within that subsection, either. *See* Doc. 102-2 ¶¶ 4, 15–25, 32. In sum, Doe has not alleged facts

sufficient for the Court to find that the General Council comes within the reach of Georgia's long-arm statute. With that, the Court moves to the second step of the personal jurisdiction analysis—due process.

### *2. Due Process Analysis*

The Due Process Clause requires that non-resident defendants have fair warning that they may be subject to suit in foreign jurisdictions. *See Del Valle*, 56 F.4th at 1275. Such fair warning comes in two forms: general jurisdiction and specific jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction exists where a defendant's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 317 (1945)). "[A]n individual is subject to general jurisdiction in her place of domicile. And the equivalent forums for a corporation are its place of incorporation and principal place of business." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021) (quotation marks omitted).

For specific jurisdiction, courts "examine whether (1) the plaintiff's claims arise out of or relate to one of the defendant's contacts with the forum state; (2) the nonresident defendant purposefully availed itself of the privilege of conducting activities within the forum state; and (3) the exercise of personal jurisdiction is in

accordance with traditional notions of fair play and substantial justice." *Del Valle*, 56 F.4th at 1275 (quotation marks omitted). "The plaintiff bears the burden of establishing the first two requirements, and then the burden shifts to the defendant to establish that [the] exercise of jurisdiction would offend principles of fair play and substantial justice." *ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332, 1341 (11th Cir. 2025).

The first prong requires a showing that the "controversy is related to or arises out of a defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quotation marks omitted); *see also Ford Motor Co.*, 592 U.S. at 365. "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State," however. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). That's because specific jurisdiction also hinges on the second prong—whether the "defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.*; *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

As for the final prong of the specific jurisdiction analysis, the exercise of jurisdiction must "not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. To determine whether exercise of personal jurisdiction

would be unfair, the Court considers "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering substantive social policies." *Brandenburg*, 880 S.E.2d at 631 (alterations adopted).

As with Georgia's long-arm statute, Doe similarly has failed to show how due process would permit the Court to exercise jurisdiction over the General Council. General jurisdiction "extends to 'any and all claims' brought against a defendant," but "only when a defendant is 'essentially at home' in the State." *Ford Motor*, 592 U.S. at 358 (quoting *Goodyear*, 564 U.S. at 919). The General Council correctly argues that it is not "at home" in Georgia because it is a Missouri non-profit, is registered to do business only in the state of Missouri, and has operated solely out of its principal place of business in Springfield, Missouri, at all relevant times. *See* Doc. 102-1 at 16; Doc. 102-2 ¶ 4; SAC ¶ 18; *see also Ford Motor*, 592 U.S. at 358.

The Court similarly lacks specific jurisdiction over the General Council. Doe's cause of action does not arise out of the General Council's contact with Georgia. *See supra* at 20–22. As discussed above, she does not allege sufficient facts to show that she was trafficked at any Georgia-based *General Council* events. So, her cause of action—labor trafficking—against the General Council does *not* arise out of its contacts with the forum. *See Helicopteros*, 466 U.S. at 414. Similarly, she

does not actually allege that the General Council "coordinat[ed] with the others involved in the trafficking scheme in Georgia to get [Doe] and others to their events." Doc. 105 at 20 (citing SAC ¶¶ 53–54). The paragraphs she cites as support just do not say that. *See St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002) ("The scope of the review must be limited to the four corners of the complaint.").

The Court also disagrees with Doe's argument that jurisdiction is proper because "Daniel Palmer and his [Entities] generated substantial institutional benefits for [the General Council] from Georgia." Doc. 105 at 19. Those benefits, she contends, are that the General Council "received an increase in tithing, church membership, ministerial outreach, spread of [General Council] doctrine, ministerial students, and credentialed [General Council] ministers," which "are supportive of [the General Council's] prerogatives to 'encourage and promote the worship of God' and to 'respond to human need with ministries of compassion.'" *Id.* at 19–20 (quoting Doc. 102-3). But, that is "precisely the sort of unilateral activity of a third party that cannot satisfy the requirement of contact with the forum State." *ECB USA*, 148 F.4th at 1343 (quoting *Walden v. Fiore*, 571 U.S. 277, 291 (2014)) (quotation marks omitted).

The Court also rejects Doe's argument that her alleged participation in General Council events outside the state of Georgia somehow subjects the General Council to jurisdiction in Georgia. *See* Doc. 105 at 20 (citing SAC ¶¶ 2, 13, 54–55,

247, 420). The General Council's "actions in [Missouri] did not create sufficient contacts with [Georgia] simply because [it] allegedly directed [its] conduct at plaintiffs whom [it] knew had [Georgia] connections." *See Walden*, 571 U.S. at 289. "Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis." *Id.*

The General Council likewise did not purposefully avail itself of the privilege of Georgia's laws. It is uncontested that the General Council: (a) has no employees in Georgia and does not transact business in the state; (b) does not own any property in the state; and (c) acts persistently only in Missouri.

Doe puts a lot of stock into the fact that the General Council credentialed, and renewed annually, Daniel's ministerial application. *See* Doc. 105 at 19–20. But, giving credentials to ministers and churches who, themselves, apply from within the forum state does not indicate that the General Council has taken advantage of "the benefits and protections of [Georgia's] laws." *See Hanson*, 357 U.S. at 253. Also, Doe does not contend that the ministering credential itself harmed anyone. Nor, on the facts of this case, would it be a plausible contention that the credentials themselves caused any harm to anyone. Although Doe alleges that the ministering credential gave the Palmer Entities an air of legitimacy, the credentials themselves did nothing to cause a tort or omission in Georgia. Indeed, Doe alleges that Daniel Palmer illicitly raised more than $1.2 million using "unpaid labor" in 2010—the year

before he applied for Council credentials. SAC ¶ 330; *see also id.* ¶¶ 312–29. In other words, he allegedly ran the same trafficking scheme in 2010 *without* the benefit of the Council's ministerial credentials. The Court, therefore, rejects Doe's argument that the credentials themselves harmed anyone in Georgia.

* * *

For all these reasons, Doe's Second Amended Complaint does not sufficiently allege facts for the Court to find that the General Council is subject to personal jurisdiction in Georgia. Based on the allegations in the Second Amended Complaint and the facts developed during jurisdictional discovery, the Court cannot force the Missouri-based General Council to litigate this case in Georgia. All claims against the General Council, therefore, are **DISMISSED**. With that, the Court turns to the merits of the claims against the Georgia District Council.

### B. The Court Dismisses the Claims Against the District Council for Failure to State a Claim.

The Court will divide the rest of the Order as follows. *First*, the Court discusses why the church autonomy doctrine does not bar consideration of the merits of Doe's Second Amended Complaint. *Second*, the Court explains why Doe's Second Amended Complaint fails to state a claim against the Georgia District Council.

### *1. The Church Autonomy Doctrine Does Not Bar Doe's Claims Against the District Council.*

The Georgia District Council first argues that the church autonomy doctrine bars Doe's claims. As it puts it, the Second Amended Complaint "hinges on issues of ecclesiastical doctrine and polity which are issues barred from civil adjudication." Doc. 101 at 6 (emphasis omitted). The Court, however, disagrees. The Court need not question, or second-guess, any ecclesiastical decision (i.e., church governance) of the Council to decide that Doe's claims fail. For that reason, and others discussed below, the Court finds that the church autonomy doctrine does not bar the consideration of her claims.[5]

The church autonomy doctrine finds its roots in the First Amendment to the United States Constitution. The First Amendment commands: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. It guarantees religious organizations the "power to

---

[5] Some courts have held that the church autonomy doctrine provides "constitutional immunity from suit" and, therefore, "must be resolved at the threshold of litigation." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 157 F.4th 627, 641 (5th Cir. 2025); *see also Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 808 (9th Cir. 2024) ("Delineating a religious organization's decisions between religious and secular would create excessive entanglement between the church and state, given the coercive nature of the discovery process."). Others have viewed it differently. *See, e.g.*, *O'Connell v. United States Conf. of Cath. Bishops*, 134 F.4th 1243, 1249 (D.C. Cir. 2025) (concluding that the church autonomy doctrine "may be raised as a defense in a civil suit, but it does not immunize religious organizations from civil actions"). The Court is not aware of any binding authority that discusses the issue; for that reason, the Court does not decide one way or the other that this is a threshold issue. It merely discusses it first for organizational purposes.

decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This "general principle of church autonomy," known as the church autonomy doctrine, protects "independence in matters of faith and doctrine and in closely linked matters of internal government," including "the selection of the individuals who play certain key roles." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747, 746 (2020).

Federal courts have identified several "areas where church autonomy has barred judicial interference." *McRaney*, 157 F.4th at 636. The first is the ministerial exception. "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe*, 591 U.S. at 746. In other words, "a church's independence on matters of faith and doctrine requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Id.* at 747 (quotation marks omitted). Second, "courts must take care to avoid 'resolving underlying controversies over religious doctrine.'" *Id.* at 751 n.10 (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969)). Third, courts should abstain from adjudicating a dispute regarding matters of church discipline. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25 (1976). And, the fourth is

the protection against "the very process of inquiry leading to findings and conclusions" about a church's internal affairs, "which may impinge on rights guaranteed by the" First Amendment. *N.L.R.B. v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979).

None applies in this case. The church autonomy doctrine does not provide that "religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe*, 591 U.S. at 746. In this case, Doe has asserted civil claims against the Councils premised on allegations of labor trafficking. As the Court's analysis on the merits below will show, none of the elements of the claims she brings requires the Court to interfere in the selection of Assemblies of God ministers, resolve any questions of religious doctrine, adjudicate any disputes over church discipline, or preside over any inquiries into the Assemblies of God's internal affairs. Instead, the Court need only decide whether the Georgia District Council knew or should have known of the alleged trafficking scheme. That analysis will not require the Court to interfere with any actual ecclesiastical decision of the Council. As such, the Court now turns to the merits of Doe's claims.

***2. Doe Fails to State a Claim Against the Georgia District Council***

Doe brings seven total claims against both Councils. The first four are beneficiary claims under the TVPRA. The fifth is a claim of conspiracy to commit violations of the TVPRA. The sixth claim is "respondeat superior / supervisory

liability." And, the final claim is for breach of fiduciary duty. The Court will discuss the claims as follows: (a) the beneficiary TVPRA claims; (b) the conspiracy to commit TVPRA violations claim; (c) the respondeat superior claim; and (d) the breach of fiduciary duty claim.

***a. Doe's TVPRA Beneficiary Claims Fail***

The TVPRA criminalizes various forms of forced labor. As relevant here, the Act forbids: (a) peonage, 18 U.S.C. § 1581; (b) involuntary servitude, *id.* § 1584; (c) forced labor, *id.* § 1589; and (d) trafficking with respect to peonage, involuntary servitude, or forced labor, *id.* § 1590. In addition to criminalizing such behavior, the Act also provides a civil cause of action for victims of certain TVPRA violations. *See id.* § 1595(a).

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (**or whoever knowingly benefits,** or attempts or conspires to benefit, **financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter**) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.

*Id.* (emphasis added). As indicated by the bolded phrase, a TVPRA victim can sue not only the perpetrator of a trafficking scheme, but also anyone who knowingly benefited from it. Courts "refer to the additional claim against 'whoever knowingly benefits' as a 'beneficiary claim.'" *A.G. v. Northbrook Indus., Inc.*, 171 F.4th 1257, 1268 (11th Cir. 2026).

The Eleventh Circuit has distilled the beneficiary claim down to four elements. The plaintiff must show that the defendant:

> (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA.

*Northbrook Indus.*, 171 F.4th at 1268, 1270 (quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021)) (quotation modified to reflect the panel's disavowal of *Red Roof*'s dicta about the fourth element of the test). The Court first discusses where the parties agree and then moves to the areas of disagreement.

The parties do not dispute the third element of the test—that the Palmer Entities' alleged behavior violated the TVPRA—so, the Court will not discuss it at length. Suffice it to say that the Court finds that Doe has adequately alleged that the Palmer Entities forced her to work for them—which could be a violation of the TVPRA. For example, she has plausibly alleged that they violated Section 1581 (peonage) by making her work for free to satisfy a debt and then threatening her when she attempted to stop working for them. *See supra* at 9. *See Clyatt v. United States*, 197 U.S. 207, 215 (1905) ("[P]eonage, however created, is compulsory service,—involuntary servitude. The peon can release himself therefrom, it is true, by the payment of the debt, but otherwise the service is enforced."); *Bernal v. United States*, 241 F. 339, 342 (5th Cir. 1917) ("It is sufficient to constitute the crime [of

peonage] that a person is held against his will and made to work to pay a debt."). Because the same central allegations attach to each alleged violation, the Court will refer to the Palmer Entities' scheme as a "forced labor scheme." With that, the Court turns to the first element of the test, which the parties do contest.

### *i. Knowingly Benefits*

"Knowingly benefits" means that "the defendant knew it was receiving some value" for its alleged part in the trafficking venture. *Red Roof*, 21 F.4th at 724. Both Councils contend that receiving tithes or other monetary contributions from the Palmer Entities cannot constitute a "knowing benefit." *See* Doc. 101 at 12–14; Doc. 102 at 19–20. But, in so doing, they conflate the "knowingly benefitted" element with the rest of the test. If, as Doe alleges, the Councils received—and reported on their taxes—nearly $40,000 in donations from the Palmer Entities in 2015, SAC ¶¶ 422, 424, that's enough for the "knowingly benefitted" element. *See Red Roof*, 21 F.4th at 724. That's not to say that it's adequately alleged that they knew the money was tainted or that it came from trafficking proceeds; instead, all that matters for this element is that "the defendant knew it was receiving some value." *See id.* And, based on Doe's allegation, the Councils did know at least that much. *See* SAC ¶ 422.

### *ii. Common Undertaking or Enterprise*

The second element of the test is referred to as the "participation in a venture" element. That means "a defendant took part in a common undertaking or enterprise

involving risk and potential profit." *Northbrook Indus.*, 171 F.4th at 1268 (quoting *Red Roof*, 21 F.4th at 725) (quotation marks omitted). Put differently, "[t]o be liable under § 1595, defendants must take part in a common enterprise to the extent that they share legal risks and potential profits with traffickers." *Id.*

Even though this element "is a fact-specific inquiry that courts must engage in when evaluating beneficiary claims," the Eleventh Circuit has helpfully delineated the boundaries a bit. *See id.* at 1269. For example, "observation is not participation under § 1595." *Id.* In other words, it's not enough that to allege that the defendant provided "standard commercial services to traffickers" and that the defendant had "knowledge of [the traffickers'] activities." *Id.*

In an opinion about sex trafficking at a hotel, the Eleventh Circuit explained that "merely renting a hotel room to traffickers, coupled with constructive or actual knowledge of sex trafficking," is not enough to show "participation in a venture." *Id.* That's because, "[t]o share legal risks and profits with a perpetrator under the TVPRA, something more than engaging in an ordinary buyer-seller transaction is required," like offering "personalized support to a . . . trafficker." *Id.* (quotation marks omitted and alteration adopted). "Mere arms-length transactions are simply not enough involvement to constitute 'participation in a venture.'" *Id.* (quotation marks omitted and alteration adopted).

Here, Doe has failed to show how the Councils "voluntarily participated" "in a common undertaking or enterprise involving risk and potential profit." *Red Roof*, 21 F.4th at 725. As discussed above, it's plausible that Doe has adequately pleaded that the Palmer Entities were running a trafficking venture as defined by the TVPRA. But, she does not connect the dots between the Palmer Entities' running of the venture and the Councils' alleged, active participation in it.

The following three examples illuminate the distinction between merely observing or facilitating—passively—a trafficking venture and actively participating in it. *See Northbrook Indus.*, 171 F.4th at 1272 ("Hilltop Inn having policies in place to facilitate sex trafficking, standing alone, is insufficient to establish [the defendant's] 'participation in a venture' under § 1595 because it does not show personal support of [the perpetrator's] sex trafficking operation."). As these examples illustrate, the passive observer or facilitator does not have liability, while the active participant does. *See id.*

On one side of the spectrum sit the hotel franchisors in *Red Roof*. In *Red Roof*, the plaintiffs had alleged that hotel franchisors actively participated in a sex trafficking venture. They had pleaded that "the franchisors owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms at the hotels." *Red Roof*, 21 F.4th at 726. And, that "the franchisors profited from this 'sex trafficking venture' through room fees and

should have known that this venture victimized them in violation of the TVPRA." *Id.* at 727. They also had alleged "that the franchisors investigated the individual hotels, took remedial action when revenue was down, read online reviews mentioning prostitution and crime occurring generally at the hotels, and controlled the training of managers and employees who were allegedly involved in facilitating sex trafficking at the hotels." *Id.* The Eleventh Circuit summarized their allegations as follows: "Their only allegations as to the franchisors' knowledge or participation in those sex trafficking ventures are that the franchisors sent inspectors to the hotels who would have seen signs of sex trafficking and that they received reviews mentioning sex work occurring at the hotels." *Id.* That wasn't enough, though, because "observing something is not the same as participating in it." *Id.*

On the other side of the spectrum sits one of the hotel owners and operators in *Northbrook Industries*. There, the owner had "moved [the perpetrator], a registered sex offender, to a room in the area where former employees testified that sex offenders were routinely placed." 171 F.4th at 1272. Not only that, but also the owner "rented a second room by the night to [the perpetrator], which was next door to [the perpetrator's] room." *Id.* And, "[a]s for the cleaning policy, [the victim] testified that [the perpetrator] instructed [the hotel] staff not to clean his second room, and no one did." *Id.* The Eleventh Circuit had no trouble concluding that "[a]

reasonable jury could find that [the owner] applied [the hotel's] room placement and cleaning policies to [the perpetrator] to enable his sex trafficking operation." *Id.*

And, finally, in the middle of the spectrum—albeit slightly more than enough to have a viable claim—lies the other hotel in *Northbrook Industries*. There, the victims, "while dressed provocatively, found 'customers' in the hotel parking lot, loitered in the hotel common areas, and purchased goods from the lobby convenience store, including condoms." *Id.* at 1271. And, "the traffickers would spend 15–20 minutes talking with hotel staff per day, and one night [a perpetrator] persuaded a [hotel] front desk employee over the phone to allow [the victims] back into the hotel room they were locked out of." *Id.* Again, one of the victims testified, "when she was locked out a second time at [the hotel], once again one of her traffickers persuaded a [hotel] front desk employee over the phone to allow her back into the hotel room." *Id.* The Eleventh Circuit held that, while that evidence was "not overwhelming," it was "an example of 'something more' than merely renting rooms to sex traffickers." *Id.*

The allegations in Doe's Second Amended Complaint fall on the *Red Roof* (i.e., insufficient) side. In total, she argues the following establishes the Georgia District Council's participation in the Palmers' alleged trafficking venture:

> [Doe] and others were trafficked at official [Georgia District Council] events, camps, conferences, festivals, and programs, ran active social media accounts touting the [Palmer Entities], maintained ongoing oversight of [the Palmer Entities], provided direct financial support to the [Palmer Entities], and had

> interactions with laborers who directly told [the Georgia District Council] that they were sleeping three hours per night on a floor, eating scraps, while fundraising."

Doc. 103 at 18 (citing SAC ¶¶ 13, 14, 46, 54, 387–401, 420, 428–35). She also says that a Georgia District Council representative would give the missionaries "pep talks." *See id.* at 19 (citing SAC ¶¶ 260–61, 401).

The problem for Doe is that none of that demonstrates that the Georgia District Council played an *active* role in the *forced* labor scheme. Sure, the Georgia District Council allegedly used volunteers from the Palmer Entities at its events. And, sure, at least one of those volunteers described poor conditions to a Georgia District Council representative. So, maybe there's enough alleged to show that the Georgia District Council facilitated the Palmer Entities' volunteer (or unpaid) labor scheme. But, that is not the alleged crime here. The alleged crime (or venture) here is *forced* labor. There just is no allegation that the Georgia District Council did anything to actively participate in a *forced* labor scheme. Doe's allegations fall short of establishing that the Georgia District Council "took part in the common undertaking of [labor] trafficking." *Red Roof*, 21 F.4th at 727.

Doe fails to distance her allegations from the facts in *Red Roof*. She contends: "That case, for instance, did not also involve: trafficking at Red Roof Inns corporate events; victims eating dinner at Red Roof Inns' executives' houses; victims sleeping at Red Roof Inns' head offices after being forced to labor there—which are the

equivalent of the allegations here." Doc. 103 at 18 (citing SAC ¶¶ 392–401). But, again, she misses the point. Sleeping at a Georgia District Council event and eating with Council representatives is not forced labor. Nor would it be a plausible inference for this Court to make that providing food and a place to sleep to volunteers (free of charge) is the same as participating in a forced labor scheme.

Again, merely observing that the Palmer Entities used volunteers at Georgia District Council events is not enough. And, encouraging the volunteers to keep volunteering is not enough. Perhaps it's true that Doe has alleged that the Georgia District Council observed the Palmer Entities forcing Doe (or others) to work for free at its events. Even still, that likewise would not be enough. Indeed, "observing something is not the same as participating in it." *Red Roof*, 21 F.4th at 727. Because Doe has not plausibly alleged that the Georgia District Council participated in—that is, did something more than merely observe—the Palmer Entities' forced labor scheme, her claims fail, and the Court need not go any further. Nonetheless, the Court will explain why she has failed to adequately plead that the Councils knew or should have known about the Palmers' alleged trafficking venture.

***iii. Constructive or Actual Knowledge***

Even if Doe's allegations were enough to establish that the Georgia District Council participated in the labor trafficking scheme, there is no allegation that demonstrates it did so knowingly. In other words, Doe has failed to allege, as she

must, that the Councils had "either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated the TVPRA." *Red Roof*, 21 F.4th at 725; *see also Northbrook Indus.*, 171 F.4th at 1270 (clarifying that the plaintiff does not necessarily need to prove that the beneficiary knew that the perpetrator was trafficking the plaintiff herself). As the Eleventh Circuit recounted in *Red Roof*, "'Knowledge' is 'an awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact.'" *Red Roof*, 21 F.4th at 723–24 (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019)). "Constructive knowledge, on the other hand, is that knowledge which 'one using reasonable care or diligence should have.'" *Id.* at 725 (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)).

Doe argues that the Georgia District Council *knew* (or should have known) that the Palmer Entities were running a forced labor scheme based on the following. She says the Georgia District Council should have known about the forced labor scheme based on: "Daniel Palmer's sexual improprieties, his choice of flesh over God and his hesitancy to agree to refrain from alcohol, tobacco, illicit drugs and gambling as admitted in his ministerial application prior to [the Georgia District Council] recommending him to be a licensed minister." Doc. 103 at 20 (citing SAC

¶¶ 301–309). But, she fails to connect the dots or explain what that has to do with this alleged forced labor scheme.

She also says that the Council "ignored his openly bragging to [it] about how much his missionary [sic] made in 2010, and whether that should have triggered [the Georgia District Council's] investigation into *how* exactly he was making this money." *Id.* Again, that misses the mark. What matters is if the Georgia District Council knew or should have known that Daniel Palmer ran a *forced* labor program. Not whether it knew that he ran a fiscally successful volunteer missionary program. She contends, without any further argument, that the fact that his program was successful was reason enough for the Georgia District Council to question whether he was *forcing* his missionaries to volunteer.

Doe essentially wants this Court to make implausible inferences that her own Second Amended Complaint refutes. For example, she says that one of the Palmer Entities had publicly stated in 2014 "that it partners with major catering companies around the United States to provide *volunteers* to staff suites, provide food and beverage runners, warehouse help and other onsite event logistics." SAC ¶ 80 (emphasis added). In other words, everyone was told that this was purely a volunteer organization that helped "raise funds for God's Kingdom." *See id.* And, she explains in great detail how the organization made money—it would provide volunteers (like Doe) to work at events in exchange for "donations." *See id.* ¶¶ 62–97. So, yes, she

has shown that the Palmer Entities made money off of volunteer labor. But, nowhere does she explain how it would have been a plausible inference (or something that could have been found out through reasonable care) for the Georgia District Council to leap from "the Palmer Entities make money providing volunteer labor" to "the Palmer Entities are running a forced labor scheme."

Perhaps what makes Daniel Palmer's alleged scheme so insidious is that it was so easy to cover up—indeed, churches often solicit and accept volunteer work. But, the Georgia District Council does not open itself up to labor trafficking liability every time it accepts missionaries to volunteer at one of its events. It's widely known that churches often have volunteers working at them. Indeed, as Doe herself alleged, she "understood that volunteering would be part of her missionary work." SAC ¶ 102. For beneficiary liability to attach here, there must be something more alleged.

The closest Doe comes to alleging knowledge on the part of the Georgia District Council is the complaint about conditions that one missionary made to a Council representative. *See supra* at 13. That missionary (or laborer, as alleged) told the representative that they "slept just '3 hours a night' on the floor in between labor shifts at a 3-week working event." SAC ¶ 260. And, that they "would often scrape caviar off of plates headed to the trash." *Id.* And, that "they were not paid for their work at the event." *Id.* Deplorable as the conditions might have been, again, it doesn't matter whether the Georgia District Council representative knew that the

missionaries provided unpaid labor (i.e., volunteer work) in poor conditions. *Cf.* Doc. 103 at 20 (also alleging that Georgia District Council interacted with the alleged victims and was on "notice" of the poor conditions). Indeed, *all* that matters is whether he (or the Council itself) knew that the unpaid labor was *forced*. Because Doe has not alleged that the Georgia District Council knew or should have known that the Palmer Entities were *forcing* their apparently willing volunteers to work at events, there can be no beneficiary liability here.

* * *

For all these reasons, Doe has failed to adequately plead a TVPRA beneficiary claim against the Georgia District Council. Relatedly, even if the Court had found earlier that it had jurisdiction over the General Council, for the same reasons discussed here, it would find that Doe has failed to adequately plead a TVPRA beneficiary claim against it, either. Counts I–IV are **DISMISSED**.

***b. Doe's TVPRA Conspiracy Claim Fails***

Doe's fifth cause of action against the Councils—conspiring to benefit from a TVPRA scheme—fails for the same reasons as discussed above in Part III.B.2.a. Although Doe labels this claim, "Conspiracy to Commit Violations of the TVPRA," *see* SAC at 105 (Count V), it is more accurately described as just an alternative way to plead a TVPRA beneficiary violation. *See* 18 U.S.C. § 1595(a). Indeed, it has

three of the exact same elements as the Court's analysis above did. All that changes is the first element—which already tipped in Doe's favor above.

TVPRA beneficiary liability attaches to "whoever knowingly benefits, **or attempts or conspires to benefit**, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" a violation of the TVPRA. 18 U.S.C. § 1595(a) (emphasis added). Though the Court is unaware of any binding precedent that defines what it means to "attempt[] or conspire[] to benefit" from an alleged scheme, the Court need not define it in this case. Congress obviously and plainly instructed that attempting or conspiring to benefit from an alleged scheme is an interchangeable element with knowingly benefiting from it. *See Jackson v. Comm'r of Soc. Sec.*, 601 F.3d 1268, 1272 (11th Cir. 2010) ("We must presume that Congress said what it meant and meant what it said." (alteration adopted)); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (quotation marks omitted)).

Put more succinctly, Congress gave victims a cause of action against "whoever knowingly benefits, or attempts or conspires to benefit," from a scheme. 18 U.S.C. § 1595(a). That is just an expanded version of the first element of the test described in *Red Roof* and *Northbrook Industries*, attaching liability to whoever:

> (1) knowingly benefited (**or attempted or conspired to benefit**), (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA.

*Northbrook Indus.*, 171 F.4th at 1268, 1270 ("or attempted or conspired to benefit" language added and emphasis added). Even in a "conspiracy" TVPRA claim, Doe still has to adequately allege that the Council participated in a venture and had knowledge (or constructive knowledge) that it violated the TVPRA. For the reasons discussed above, she has not done so. So, her "conspiracy" claim fails.

Doe also cites as a potential for liability Section 1594(a) and (b). SAC ¶ 552. But, those are criminal provisions, not civil ones. *See, e.g.*, *United States v. Brown*, 125 F.4th 1043, 1053 (11th Cir. 2025) (describing conspiracy to commit trafficking under Section 1594 as a criminal offense).

For these reasons, Doe's fifth cause of action, Count V, is **DISMISSED**.

***c. Doe's Vicarious Liability Claim Fails***

Doe's Count VI—which she calls "Respondeat Superior/Vicarious Liability"—fails for several independent reasons. *First*, she fails to plead a specific, underlying tort of "Daniel Palmer and other co-conspirators" for which the Georgia District Council could be vicariously liable. *See* SAC ¶ 558; *id.* ¶¶ 557–61. *Second*, she fails to sufficiently allege that Daniel Palmer was working as an agent of the Georgia District Council when he allegedly forced her to work for free. And, *third*,

she does not adequately allege that the Council ratified any of Daniel Palmer's unidentified torts.

Vicarious liability is not a standalone tort. Indeed, for a finding of vicarious liability, a plaintiff "must first prove the existence of an underlying tort." *See Cotton States Mut. Ins. Co. v. Kinzalow*, 643 S.E.2d 172, 174 n.3 (Ga. Ct. App. 2006). She must also prove "the [agent] was acting in furtherance of the [principal's] business and that he was acting within the scope of the employer's business when the tort was committed." *Id.*

Doe's vicarious liability claim fails because she does not allege with specificity what tort Daniel Palmer committed that makes the Georgia District Council vicariously liable. For example, she alleges that the Georgia District Council is liable "for Daniel Palmer and other co-conspirators' acts." SAC ¶ 558. And, she claims that the Council "acted through agency, joint venture and/or common enterprise when [it] exposed Plaintiff and other victims to the abuse of Daniel Palmer and other co-conspirators." *Id.* ¶ 559. Those are the only allegations that even come close to alleging specifically which acts she intends to hold the Council vicariously responsible. To be sure, Doe's Second Amended Complaint contains many allegations of wrongdoing on the part of Daniel Palmer. But, it does not include any actual causes of action against him. *See generally* SAC. Nor does this section of the Second Amended Complaint include with specificity which of those allegations of

wrongdoing should be imputed to the Council. *See also* Doc. 103 at 25 (arguing that Doe "has plausibly alleged that [the Georgia District Council] is vicariously liable for the conduct of Daniel Palmer and his Ministries"). Without more, the Court is left guessing whether Doe is trying to hold the Council responsible for Daniel's (or some unnamed "co-conspirator's") alleged negligence, abuse, TVPRA violations, and/or some other state or federal tort. That's simply not good enough for federal pleading standards. *See Twombly*, 550 U.S. at 555.

Her Second Amended Complaint also falls short of adequately alleging that Daniel Palmer was, in fact, an agent of the Georgia District Council. Here are her allegations on that front: "Daniel Palmer and other co-conspirators were acting within the course and scope of his role as a member of [the Councils] and was supervised in this role by the Defendants," SAC ¶ 558; "Daniel Palmer and other co-conspirators were acting within the course and scope of his role as an agent and member of the Defendants' organizations" *id.* ¶ 559. "Those allegations are mere recitations of the requirements for [agency] liability, and [Doe] do[es] not allege any facts to support them." *Red Roof*, 21 F.4th at 729 (citing *Iqbal*, 556 U.S. at 663).

Further, Doe fails to adequately allege that the Georgia District Council controlled the Palmer Entities to the extent required for vicarious liability. She points to the following as establishing control: (a) "Daniel Palmer and his Ministries was affiliated with [the Georgia District Council] for the entire relevant period," (citing

SAC ¶¶ 270–73); (b) "such affiliation meant that Daniel Palmer was subject to [the Georgia District Council's] oversight," (citing *id.* ¶¶ 269–70); (c) "[the Georgia District Council] had the power to discipline Daniel Palmer," (citing *id.* ¶ 280); (d) "Daniel Palmer and his Ministries were required to follow the AG Constitution, Bylaws and disciplinary guidelines, which included delegating authority to [the Georgia District Council] to credentialing ministers," (citing *id.* ¶ 278); and (e) "[the Georgia District Council] had the power to credential Daniel Palmer, which includes the authority to investigate, discipline, restore, supervise and reinstate ministers," (citing *id.* ¶¶ 341–74). Doc. 103 at 23–24. But, as Georgia courts have made clear in the analogous franchisor-franchisee context,[6] a franchisor "may protect its [brand] and its [reputation] by setting standards," which can be "quite detailed, specific, and strict," without becoming vicariously liable for the franchisee's actions. *See Schlotzsky's, Inc. v. Hyde*, 538 S.E.2d 561, 563 (Ga. Ct. App. 2000). "A franchisor's reserving the right to inspect, monitor, or evaluate the franchisee's compliance with its standards and to terminate the franchise for noncompliance is *not* the equivalent of retaining day-to-day supervisory control of the franchisee's business operations

[6] Doe fights the premise that the Georgia District Council could have a relationship with the Palmer Entities that is analogous to a franchisor-franchisee relationship. *See* Doc. 103 at 25. The Court thinks that the analogy is apt. Like a franchisor, the Georgia District Council (through the General Council) can give ministering credentials to individuals and churches. And, like a franchisor, the Council has retained "the right to inspect, monitor, or evaluate the [church's/minister's] compliance with its standards and to terminate the [church's/minister's credential] for noncompliance." *See Schlotzsky's, Inc. v. Hyde*, 538 S.E.2d 561, 563 (Ga. Ct. App. 2000).

as a matter of law." *Id.* Because Doe has not alleged that the Georgia District Council retained day-to-day supervisory control over the Palmers or their Entities, she has not adequately alleged control for vicarious liability to attach to their actions. *See id.*

Relatedly, Doe mistakenly claims that she has "sufficiently pled allegations demonstrating that [the Georgia District Council] ratified Daniel Palmer's conduct, which can be done after the fact, and which does not require day-to-day control." Doc. 103 at 22. For one thing, she, again, does not say which tort of Palmer's the Council ratified. For another, if that tort is related to the alleged TVPRA violation, the Court has already found that the Council did not have knowledge of the Palmers' alleged scheme for beneficiary liability. *See supra* at 39–43. So, the Court is hard-pressed to find, as it must do for ratification, that the Council "had 'full knowledge of all the material facts' regarding [Palmer's] actions in assisting and facilitating [labor] trafficking." *Red Roof*, 21 F.4th at 729 (denying a ratification theory after already denying TVPRA beneficiary liability because "the principal must also have 'full knowledge of all the material facts' for . . . acceptance and retention to constitute ratification").

And, Doe has failed to plausibly allege apparent agency between the Georgia District Council and Daniel Palmer. Apparent agency requires plaintiffs to plausibly allege "(1) that the alleged principal held out another as its agent; (2) that the plaintiff justifiably relied on the care or skill of the alleged agent based upon the alleged

principal's representation; and (3) that this justifiable reliance led to the injury." *Kids R Kids Int'l, Inc. v. Cope*, 769 S.E.2d 616, 619 (Ga. Ct. App. 2015). Crucially, "it is not enough that the plaintiff *believe*[s] that an agency relationship exists," nor "that the *agent* represent[s] his status as agent," instead, the *principal* must have "held out the agent as its agent." *Id.* at 618–19 (quotation marks omitted). Doe alleges that "Daniel Palmer was an agent of [the Councils]," and that she "believed Daniel Palmer was acting on behalf of [the Councils]." SAC ¶¶ 8, 243. But, without allegations that the Georgia District Council held Daniel Palmer out as its agent, Doe's own belief that Daniel Palmer was the Council's agent is insufficient. *Kids R Kids*, 769 S.E.2d at 619.

Doe argues that she has alleged that the Georgia District Council did, in fact, hold Palmer out as its agent. Doc. 103 at 24. But, of the actions she points to, none establishes apparent agency. First, similar to the Court's conclusion above in the credentialing discussion, acting as the "regional district" for Palmer's church is insufficient, by itself, for a finding of vicarious liability. *See supra* at 47–49. Second, the argument that the General District Council "promoted Daniel Palmer's Ministries" is not specifically alleged in the Second Amended Complaint. The only specific allegations about any "promotions" are screenshots of a Georgia District Council employee's personal Instagram posts, which thanked the students for their volunteer work, *see* SAC ¶¶ 393–97—far from the Georgia District Council itself

holding Palmer out as its agent. Third, Doe argues in conclusory fashion that the Georgia District Council's use of Palmer's volunteers at its events establishes apparent authority. *See* Doc. 103 at 24. But, she does not explain how one organization hiring another organization to provide volunteers for an event is an action that would make the latter's organization's volunteers reasonably think that their organization is the former's agent. That logic would not make sense, either. Just because the Council hired Palmer's organization to provide volunteers at events does not mean that the Council "held out" Palmer as its agent—or that one of the volunteers would be justified in thinking as much. *See Butkus v. Putting Greens Int'l Corp.*, 475 S.E.2d 693, 695 (1996). And, finally, as discussed above, *see supra* at 42–43, the fact that a Georgia District Council representative did not act on a complaint of the volunteer's conditions does not establish that Palmer was apparently acting on the Council's behalf—if anything, it shows the opposite. The other allegations that Doe points to for apparent authority all relate to someone else's actions other than the Georgia District Council's. *See R Kids*, 769 S.E.2d at 618–19. Finding no adequately pleaded allegations that would show that the Council held Palmer out as its agent, the Court concludes that Doe has failed to plausibly allege apparent agency between the Council and Daniel Palmer.

Finally, even if there were adequate allegations of an underlying tort and an agency relationship, she has not argued (other than in conclusory statements) that

Daniel Palmer was acting within the scope of his agency relationship when he forced her to work for him for free. *See Cotton States*, 643 S.E.2d at 174 n.3.

In sum, Doe's "vicarious liability" claim fails on both pleading standards and the merits. Count VI is **DISMISSED**.

***d. Doe's Breach of Fiduciary Duty Claim Fails***

Doe's final cause of action, breach of fiduciary duty, suffers from many of the same defects as the previous one. Under Georgia law, "[a] claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Schinazi v. Eden*, 792 S.E.2d 94, 98 (Ga. Ct. App. 2016) (quotation marks omitted). Whether or not "[a] relationship that gives rise to a fiduciary duty exists" depends on whether "a party exercises a 'controlling influence over the will, conduct, and interest of another'" or whether "'from a similar relationship of mutual confidence, the law requires the utmost good faith.'" *Bush v. Liberty Mut. Ins. Co.*, 864 S.E.2d 657, 660 (Ga. Ct. App. 2021) (quoting O.C.G.A. § 23-2-58 (alterations adopted)).

Georgia courts have instructed that a minister and congregant share a fiduciary relationship. *See, e.g.*, *Bryan v. Norton*, 265 S.E.2d 282, 284 (Ga. 1980). But, that is not the allegation here. The Georgia District Council was *not* Doe's minister. Nor was it even her church. Instead, the Georgia District Council handled credentialing

for ministers and churches and had broad oversight of such entities. So, she must allege something more to establish such a relationship. But, she doesn't.

She alleges in baldly conclusory fashion: "The Defendants exercised a controlling influence over the will, conduct, and interest of Plaintiff, such that the law required the utmost good faith from the Defendants in safeguarding Plaintiff from known dangers." SAC ¶ 562. And: "The Defendants had a special relationship of trust with Plaintiff, and as such, owed a fiduciary duty to them for their health, safety, and well-being." *Id.* ¶ 564. Those "allegations" are ripped directly from Georgia's fiduciary duty cases—in other words, they are "labels and conclusions[] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. That just "will not do." *Id.* Count VII is **DISMISSED**.

**C. The Claims Against "John Does 1 through 50" Fail**

Jane Doe also purports to bring claims against "John Does 1 through 50." *See* SAC ¶¶ 20–21. "As a general matter, fictitious-party pleading"—meaning naming as defendants "John Does"—"is not permitted in federal court." *See Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). While there's a small exception to that general rule, Jane Doe does not meet it here. *See Dean v. Barber*, 951 F.2d 1210, 1216 (11th Cir. 1992) (allowing fictitious-party pleading where the anonymous defendant is "described with sufficient clarity . . . to allow service of process").

Because she does not describe "John Does 1 through 50" with any specificity, any claims against them are not viable in federal court.

## IV. CONCLUSION

Doe's Second Amended Complaint is full of many terrible allegations. The Court does not minimize today those allegations. Instead, it merely finds that the General Council and Georgia District Council cannot be held liable for them.

Accordingly, it is hereby **ORDERED**:

A. The General Council's Motion to Dismiss for lack of personal jurisdiction is **GRANTED.**

B. The Georgia District Council's Motion to Dismiss for failure to state a claim is **GRANTED** and the claims against it are **DISMISSED WITH PREJUDICE**.

C. The Second Amended Complaint is **DISMISSED** in its entirety. The Clerk is directed to **TERMINATE** this action.

**IT IS SO ORDERED**, this 16th day of November, 2026.[7]

William M. Ray II

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

---

[7] Doe filed a Motion for Leave to File a Surreply, Doc. 107. Finding good cause for the motion, the Court **GRANTS** it and has reviewed it. But, having considered the arguments made in it, the Court's conclusion remains the same. Doe's claims are due to be dismissed.